Elizabeth D. HOLMES and Industrial National Bank of Rhode Island, as Executors of the Estate of Howard W. Holmes, Plaintiffs,

v.

Harold BATESON and Gordon Bronson, Individually and under the trade name and style of Charles A. Maguire and Associates, C. E. Maguire, Inc. and Combustion Engineering, Inc., Defendants.

Civ. A. No. 5116.

United States District Court, D. Rhode Island.

July 6, 1977.

Supplemental Opinion Aug. 26, 1977.

Bressler, Meislin & Lipsitz, New York City, Edwards & Angell, Providence, R. I., for plaintiffs; Bernard Bressler, Alan D. Plotkin, New York City, Richard M. Borod, Edward F. Hindle, Providence, R. I., of counsel.

Hinckley, Allen, Salisbury & Parsons, Providence, R. I., Withington, Cross, Park & Groden, Boston, Mass., for Harold Bateson and Gordon Bronson; George W. Vetter, Jr., Providence, R. I., John M. Reed, Jeremiah F. Healy, III, Boston, Mass., of counsel.

Higgins, Cavanagh & Cooney, Providence, R. I., for C. E. Maguire, Inc. and Combustion Engineering, Inc.; Joseph V. Cavanagh, Providence, R. I., of counsel.

Shearman & Sterling, New York City, for defendants; W. Foster Wollen, Thomas M. Geisler, Jr., New York City, of counsel.

## OPINION

DAY, Senior District Judge.

This is a civil action in which the plaintiffs, executors of the Estate of Howard W. Holmes (the Estate), seek damages and oth-

er relief on account of alleged violations of § 10(b) of the Securities Exchange Act of 1934 (the Act) and Rule 10b–5 promulgated thereunder, as well as, the alleged commission of fraud and breach of fiduciary obligations under the laws of Rhode Island. This Court has jurisdiction over the federal claims pursuant to § 27 of the Act, 15 U.S.C. § 78aa, and pendent jurisdiction over the state claims.

The plaintiffs claim that defendants C. E. Maguire, Inc. (the Corporation), Bateson and Bronson misrepresented and failed to disclose material information in connection with the Corporation's purchase of 350 shares of its own stock from the Estate and the purchase of the Estate's interest in Charles A. Maguire and Associates (the Partnership) by Bateson and Bronson. Combustion Engineering, Inc. (Combustion), it is alleged, aided and abetted or conspired with the aforementioned defendants to violate said § 10(b) and Rule 10b–5.

The plaintiffs further contend that Bateson and Bronson as directors and together as majority stockholders of the Corporation, and holders of a majority interest in the Partnership committed fraud upon said Estate and breached their fiduciary obligations under the common law.

The evidence at trial indicated that the Partnership, an architectural and engineering consulting firm, was formed in 1942. Holmes became a partner in 1952, while Bateson and Bronson became partners eight years later. As of January 1, 1969, Holmes owned a 46% interest in the Partnership and Bateson and Bronson each possessed a 27% interest therein.

Effective January 1, 1969, Holmes, Bateson and Bronson organized the Corporation and the Partnership became a liquidating entity. Holmes was selected to be President of the Corporation; Bateson became Executive Vice President. Bronson assumed responsibility for the Corporation's finances as Executive Vice President for Finance and Administration and Treasurer. The three named themselves the sole directors of the Corporation and issued 850 shares of common stock: 350 shares to Holmes, 250 shares to Bateson and 250 shares to Bronson. The consideration for the issuance of said stock was the transfer to the Corporation of certain Partnership assets, consisting principally of the rights to perform new contracts and complete work in progress. The Partnership retained ownership of accounts receivable and related assets pertaining to services rendered prior to January 1, 1969. To obtain working capital for the Corporation, Holmes, Bateson and Bronson made loans to the Corporation in proportion to their holdings therein from their respective shares in the Partnership income.

Holmes died on April 9, 1969. At his death he owned a 46% interest in the Partnership and 41.17% of the capital stock of the Corporation. In addition, Holmes had loaned the Corporation a total of $244,000.00 which was not repaid as of March 31, 1969. Shortly after the death of Holmes, Bateson assumed the presidency of the Corporation and Bateson and Bronson became the sole directors.

The Estate retained as its counsel, John G. Coffey, a close family friend of Holmes, and attorney for the Partnership for many years. Thereafter Coffey did not represent the Corporation or Partnership. Coffey's relationship with Bateson and Bronson prior to the death of Holmes can properly be characterized as longstanding, close and marked by mutual trust.

At the time of Holmes' death, there existed a Partnership agreement, dated January 1, 1967, which set forth, *inter alia,* the terms upon which the interests of a withdrawing or deceased partner could be acquired and redistributed by the remaining partners. The said agreement also included the following significant provision:

> "Nothing contained herein, however, shall prevent the remaining partners from entering into any other mutually satisfactory arrangements or agreement with the Estate of the deceased relative to the amount or method of payment of the amount due to or from the Estate of any deceased partner."

Holmes, Bateson, Bronson and a Milton Nelson, who retired June 30, 1968, were parties to this agreement. Upon Nelson's retirement, the remaining partners proportionately redistributed Nelson's 26% interest in the Partnership and agreed to pay Nelson $400,000.00 therefor. That sum represented the agreed value of his interest fixed at the date of his retirement, less a 20% discount covering such items as problems in collection of accounts receivable, the expense of collecting the accounts and uncertainties in calculating the percentage of completion of jobs in progress. Said agreement also directed that the Partnership maintain its accounts on a cash basis, a practice which was followed.

It appears that on March 25, 1969, at the annual meeting of the Corporation, Holmes, Bronson and Bateson discussed the terms of a new Partnership agreement, not substantially different from previous agreements with respect to the redistribution of a departing partner's interest. The three also agreed to work out some method for the transfer of the corporate stock of a stockholder who died thereafter. No specific method for acquiring a deceased stockholder's shares was ever reduced to writing, nor was a new Partnership agreement executed at or after this meeting prior to the death of Holmes.

It is important to note that Coffey, who became the Estate's principal negotiator with Bateson, Bronson and the Corporation, had not been deeply involved in either the Corporation's or the Partnership's financial affairs while Holmes was alive. He was, however, aware of the contents of a report completed in December, 1967, by Booz, Allen & Hamilton, Inc. dealing with the Partnership's organizational problems. One specific criticism in that report was that the Partnership's accounting, billing and financial reporting procedures were inadequate to reveal an accurate financial picture of the Partnership. The report discussed at length the proposed incorporation of the business and made several recommendations to rectify what it regarded as weaknesses in the Partnership's financial practices. Few of these recommendations had been implemented at the time of Holmes' death.

In 1968, Coffey had introduced the partners to Edward Scheider, a consultant on subjects including mergers and public offerings. Thereafter, Coffey was informed of Scheider's advice to follow the recommendations in the said Booz, Allen & Hamilton, Inc. report before pursuing merger possibilities since few companies would be interested in the Partnership once they discovered its internal problems.

Coffey knew that the Corporation was suffering from cash flow problems and was under the impression at Holmes' death that the Corporation was in a precarious financial condition. He was also aware that the Corporation was seriously interested in merging or being acquired in order to alleviate some of its problems and that contact had been made by Bronson with Barry Wright Corporation (Barry Wright) prior to Holmes' death to discuss acquisition. Little progress had been made, however, toward actually accomplishing a merger or acquisition. Thus Coffey was reasonable in his belief that the then current prospects for completing such a move on terms which would alleviate the Corporation's financial problems were dim. Neither executor had any greater knowledge of the Corporation's financial condition or potential for merger or acquisition than did Coffey.

Between the date of Holmes' death and January 6, 1970, Bateson and Bronson received regular monthly cash statements for the Partnership and the Corporation within three weeks of the end of each month. During this same period, monthly statements of accounts receivable were prepared by the accountant for the Partnership and the Corporation. Bronson met regularly with the said accountant, and along with Bateson, regularly consulted the Corporation's divisional vice presidents to review backlog, work in progress and new projects. None of this information was shared with the Estate.

During the period between April 9, 1969 and the first Estate meeting, July 24, 1969,

Bronson met with representatives of Barry Wright on at least four occasions and Bateson met with said representatives at least once to discuss the possible acquisition of the Corporation by Barry Wright. In addition, Bronson had periodic contact by telephone with the President and with the Director of Corporate Development of Barry Wright. Bronson supplied Barry Wright with financial date on the Partnership for a ten year period ending December 31, 1968, which Barry Wright analyzed and converted into accrual data on or before July 8, 1969. During this same period, Bateson and Bronson conferred on two occasions with a Charles Hallinan of Reynolds and Company, a brokerage firm, on matters relating to acquisition and merger. Financial statements for the Partnership for the year ending December 31, 1968 became available June 8, 1969, but were not then supplied to the estate.

Bateson, Bronson, Coffey, Mrs. Holmes and Evandro Radoccia, the Trust Officer assigned by the Industrial National Bank of Rhode Island (the Bank) to discharge its duties as executor, were among those who attended the July 24, 1969 Estate meeting. No financial material was given to the Estate at the meeting, nor was any information revealed about the merger negotiations between the individual defendants and Barry Wright. The representatives of the Estate regarded the meeting as amiable, perceiving their role as working together with Bateson and Bronson toward a "common end".

Prior to the second Estate meeting, which took place on September 24, 1969, Bateson and Bronson again conferred with Hallinan. Through him they met with a representative of Science Management Corporation (Science Management) to discuss that company's possible merger with or acquisition of the Corporation.

The evidence also establishes that on August 5, 1969, Bateson and Bronson had met with the President and various other officers of Barry Wright and toured the Barry Wright facilities. On August 14, 1969, Bronson prepared, on the Corporation's sta-

tionery, a two-part report which he described as "two very brief but intended to be reasonably comprehensive confidential memoranda re the several situations which we are evaluating". The report included a description of a possible "payment program" for a deal with Barry Wright, involving a down payment of 140,000 shares of Barry Wright stock for the acquisition of the Corporation. This volume of shares matched one figure listed in exhibit 62, a handwritten memorandum containing a proposal for acquisition of the Corporation prepared by Pietz, the President of Barry Wright. Said report, which was not supplied to the Estate, bore on its face the following comment:

"There is one copy of each of these memoranda in my personal file—no others exist and needless to say, please keep these data under lock and key."

Relying primarily on the testimony of McGill, the Director of Corporate Development for Barry Wright, and the aforementioned correlation in figures between Bronson's and Pietz's memoranda, the Court finds that Barry Wright did make at least a serious, tentative offer to acquire the Corporation for Barry Wright stock worth approximately $4,800,000.00. This finding is corroborated by a letter dated January 9, 1970, from Bronson to Pietz, which assumes by its language the existence of an offer. Before conveying said offer, McGill had informed Pietz that he felt it would be fairer to offer between $5,500,000.00 and $6,000,000.00 for the Corporation.

By September 3, 1969, all divisions of the Corporation had delivered to Bronson percentage of completion information for the period ending June 30, 1969. This material was not transmitted to the Corporation's accountant despite the fact that it was the only outstanding material necessary for completion of the June 30, 1969 accrual reports. Bronson thereafter instructed the Corporation's accountant to cease preparation of said accrual reports.

On September 11, 1969, Bateson prepared a memorandum projecting earnings of $900,000.00 for the Corporation on an accru-

al basis for 1969, and valuing the Corporation at $5,800,000.00 on a cash basis and $7,500,000.00 on an accrual basis. The memorandum and drafts thereof contained comparative information on the selling prices of companies deemed by Bateson to be similar to the Corporation. Said memorandum further stated that, based upon projected earnings and comparative valuations, "it appears that we are worth something in excess of *$6,000,000.00*" (emphasis in the original). Bateson sent his memorandum to Bronson who never challenged Bateson's valuation of the Corporation. The Estate did *not* receive a copy of this memorandum.

Bateson, Bronson, Mrs. Holmes, Coffey and Radoccia, among others, were present at the Estate meeting held on September 24, 1969. At this meeting Bronson and Bateson provided the Estate with a financial statement for the Partnership for the period ending December 31, 1968, as well as, with a statement of revised estimated net worth for the Partnership and Corporation dated March 31, 1969. The latter statement reflected a recorded cash loss for the Corporation of $909,726.32. Said statement did not contain information calculated on an accrual basis. While Bateson was silent at this meeting, Bronson stated that the Corporation and Partnership were having cash problems and generally painted a black picture of the Corporation's finances.

No one informed the Estate representatives that there had been an offer of $4,800,000.00 from Barry Wright for the Corporation, nor that there had been discussions with Science Management concerning its possible acquisition of the Corporation. Neither Bateson nor Bronson advised the Estate representatives that they anticipated an accrual profit of $900,000.00 in 1969 for the Corporation or that they appraised the Corporation at a value in excess of $6,000,-000.00. Finally, no information on the profits or losses of the Corporation or Partnership for periods after March 30, 1969 was supplied to the Estate representatives.

From October 1 through October 3, 1969, Bronson was in California in connection with a project for Combustion which involved the evaluation of real estate owned by the Great Lakes Carbon Corporation. During one dinner meeting and a subsequent taxi ride to the airport, Bronson and Kiamie, the Vice President and Controller of Combustion, discussed the possible acquisition of the Corporation by Combustion. Bronson informed Kiamie of the level of the Corporation's annual revenues and that the Corporation was currently profitable. In briefly reviewing the history and business activities of the Corporation, Bronson mentioned that there was an Estate problem which the Corporation was in the process of resolving. Kiamie stated that if Bronson and Bateson were interested in Combustion's acquiring the Corporation, they ought to explore the matter more fully with Combustion representatives. Bronson replied he would like to pursue the matter. Immediately after these informal discussions in California, Kiamie contacted James Thornton of The Lummus Company, a wholly owned subsidiary of Combustion, and the latter proceeded to obtain information on the Partnership and Corporation. While Bronson met again with Kiamie in late October, there was no evidence that they discussed acquisition.

Bateson and Bronson devoted the entire day of October 8, 1969 to reviewing merger and acquisition possibilities with representatives of Science Management at its facility in Moorestown, New Jersey. Bronson informed said representatives of the Corporation's volume of business and the fact that they were negotiating with another company. On October 16, Bateson attended an all day seminar in Boston which had as its subject matter mergers and acquisitions. The following day, Bronson met with representatives of Barry Wright to discuss acquisition. Bronson prepared memoranda on Corporation stationery on October 20 and 21, 1969, containing comparisons of the advantages and disadvantages of acquisition by Science Management and Barry Wright and projections of the Corporation's earnings on an accrual basis for the years 1969 through 1972. See exhibits 30 and 31. In the memorandum of October 20, Bronson

noted that ". . . the opportunities for growth appreciation with the right merger can mean much more in compensation and security [than the sales price], particularly as we become the nucleus of a very broad based acquisition program". In his memorandum of the following day, Bronson remarked that Science Management and Barry Wright were "vitally interested" in the Corporation's becoming the nucleus of their acquisition oriented programs. Bateson received these memoranda; the Estate did not.

Bronson, Mrs. Holmes, Coffey and Radoccia were among those present at the Estate meeting held October 28, 1969. There was no disclosure of the aforementioned activities concerned with merger and acquisition. Nor was there any disclosure of the financial condition or profit and loss of either the Corporation or Partnership for any period after March 31, 1969, except Bronson's acknowledgement that the Corporation had a cash shortage. At this meeting the principals negotiated as to the total amount to be paid for the Estate's interest in the Corporation and Partnership and as to the terms, especially the period of years allowed for payment.

On October 28, following the meeting with the Estate representatives, Bronson met with Robert F. Pickard, counsel for the Corporation, Partnership, and individual defendants during negotiations with the Estate. Bronson informed Pickard of his meetings in California with Combustion and that Combustion had expressed an interest in exploring the possibility of its acquiring the Corporation. Pickard, knowing nothing of the extensive contacts which the individual defendants had had with Science Management and Barry Wright, advised Bronson that, so long as the Estate remained a stockholder, he had an obligation to disclose completely to Estate representatives all material information relating to, as well as the fact of, acquisition negotiations. It was Pickard's belief that Bronson's informal contacts with Combustion, as described to him, did not constitute negotiations.

Bronson, Mrs. Holmes, Coffey and Radoccia were among those attending a November 3, 1969 Estate meeting. Those present tentatively agreed to the payment of $815,-000.00 to the Estate for its interests in the Corporation and Partnership, this understanding being subject to the execution of written agreements. There was a discussion of the language desired for inclusion in the final agreement. In connection with this, Bronson stated that he wanted the Corporation to be able to merge, be acquired or go public in the future without intrusion from the Estate. Bronson mentioned these options only in terms of future possibilities, totally concealing the current negotiations with Barry Wright and Science Management and his contacts with Combustion. There was also no disclosure of any memoranda in which Bateson and Bronson appraised the Corporation.

Another Estate meeting was held on November 26, 1969, at which Bateson, Bronson, Mrs. Holmes, Radoccia and Coffey, among others, were present. A document was signed by which the plaintiffs, the Corporation and Bateson and Bronson as partners agreed that certain exhibits to said document would be completed and executed after the end of 1969, based upon year-end financial figures. The overall agreement contemplated payments aggregating $815,-000.00. The handwritten notation:

"To be determined as of Dec. 31, 1969 in accordance with the books of corporation and partnership."

appears in lieu of a dollar amount alongside entries for (1) the Corporation's debt to the Estate, (2) 350 shares of capital stock in Corporation and (3) interest in Partnership unrealized receivables. This document did not refer to the provision in the said Partnership agreement of January 1, 1967, which dealt with the disposition of a deceased partner's interest and made no reference to any oral understanding reached by Holmes, Bateson and Bronson. The document does acknowledge that negotiations were held between the executors, the Corporation and the Partnership with a view to determining the value of the Estate's interests in both the Partnership and Corpora-

tion and to settling on terms for disposition of those interests.

Bateson remained totally silent at this meeting. No one disclosed negotiations with Barry Wright or Science Management, Bronson's contacts with Combustion or financial data for any period after March 31, 1969.

On December 2, 1969, Bronson wrote to Radoccia setting up a meeting for January 6, 1970 to execute the final Estate settlement documents. The following day Bronson telephoned Kiamie in order to schedule a meeting for January 7, 1970 to discuss Combustion's acquisition of the Corporation. That same day Kiamie sent a memorandum to Kelly, Vice President and Secretary of Combustion, which stated in pertinent part:

"Gordon Bronson called me today and advised that they would be ready by the first week of January to begin discussions with Combustion. Apparently, they have completed their mutual arrangements with the estate of the former partner."

On December 9, 1969, Bronson projected profits of $250,000.00 on an accrual basis for the Corporation for the last quarter of 1969 based upon financial data given to him by the Corporation's accountant. On December 15 and 18, 1969, the Corporation's accountant delivered to Bronson financial data which revealed, among other things, that the Corporation had an accrual profit before taxes of $720,000.00 for the nine month period ending September 30, 1969. Bronson never shared this information with the Estate and, indeed, throughout negotiations with the Estate, neither Bronson nor Bateson told any Estate representative that the Corporation was profitable on an accrual basis.

In contrast to Bronson's concealment of the said accrual statement, the individual defendants did supply the Estate, at the January 6, 1970 meeting, with a document showing a projected loss on a cash basis for the year 1969 by the Corporation of $1,330,-000.00. The same document also reflects that the Estate had loaned the Corporation $315,000.00 from April 1 through September 30, 1969, and an additional $17,930.00 from October 1 through December 31, 1969.

Present at this January 6, 1970 meeting were Bateson, Bronson, Pickard, Radoccia, Mrs. Holmes, Coffey and the Corporation's accountant. Bronson, Bateson, the Corporation and the executors signed an agreement providing that the individual defendants would pay the Estate $182,406.69 without interest over a seven year period for the balance of its Partnership interest.

The Corporation and the executors executed a second agreement whereby the Corporation agreed to issue to the Estate a seven year, non-interest bearing installment note in the amount of $581,603.62 reflecting evidence of the $577,150.00 loaned to the Corporation by Holmes and the Estate, as well as, the purchase of the Estate's 350 shares of stock of the Corporation for $4,453.62. The Estate delivered the 350 shares and in exchange received a promissory note from the Corporation guaranteed by Bateson and Bronson individually. No reference is made in this agreement to the said Partnership agreement of 1967 or any oral understanding reached by Bateson, Bronson and Holmes.

At this January 6 Estate meeting there was no mention of Combustion or of the meeting scheduled for the next day between Bateson and Bronson and Combustion. There were no disclosures of past or current merger or acquisition negotiations or of the valuations of the Corporation which Bateson and Bronson had made.

As previously arranged, Bateson and Bronson met with Kelly and Kiamie on January 7, 1970 to discuss a possible acquisition of the Corporation by Combustion. This was Bateson's initial face to face contact with representations of Combustion. Bronson, on the other hand, had had extensive dealings with Combustion with respect to specific projects for which the Partnership and Corporation sought to be engaged or were engaged by Combustion. Bronson's first contact with Combustion occurred in late 1966 in connection with a year long project in Windsor, Connecticut for which the Partnership provided complete architec-

tural-engineering services. Thereafter Bronson worked with Combustion on a year long project in Cleveland, Ohio; on economic feasibility studies for a corporate facility in Stamford, Connecticut; and, on an evaluation of real estate owned by Great Lakes Carbon Corporation. As hereinbefore stated, it was during the performance of this last project, in early October, 1969, that Bronson and Kiamie expressed a mutual interest in pursuing acquisition negotiations.

At the January 7 meeting, Bronson showed Kiamie the said accrual financial statements for the first three quarters of 1969, and those present discussed the finances of the Corporation and Partnership, including the financial terms of the transactions with the Estate. During the course of the meeting, Kelly stated that Combustion would offer Bateson and Bronson in the vicinity of $6,000,000.00 for the Corporation and Partnership. Bateson and Bronson rejected one preliminary offer, made in terms of Combustion stock, because an unacceptable proportion of the stock was tied up in a contingent "earn-out" plan. Subsequently, the principals reached a tentative agreement which contemplated payment by Combustion in Combustion convertible preferred stock of 85,000 shares immediately and 65,000 shares on a contingent "earn-out" basis. The then market value of the preferred stock was $40.00 per share. This agreement was reduced to a draft letter of intent dated January 12, 1970, but was subject to investigation of the Corporation and Partnership by Combustion, and to approval by the Combustion board of directors.

On January 9, 1970, Bronson wrote to the President of Barry Wright explaining his and Bateson's decision to join Combustion rather than Barry Wright. The letter also states at one point:

"We could not discuss anything until after January 6, 1970, and we were not able to gauge the seriousness of indication on their [Combustion's] part until we had a meeting with them."

On February 2, 1970, Pickard delivered to Radoccia two pages to be substituted for the first two pages of the Corporate Purchase Agreement of January 6, 1970. Said substituted pages provided that the entire $581,603.62, which the Corporation contracted to pay the Estate, was consideration for the 350 shares of stock delivered by the Estate to the Corporation on January 6. The amended pages were manually substituted without being executed by the parties to the earlier agreement. There was no evidence Mrs. Holmes consented to or was then aware of the substitution. It is unclear from the record precisely why the substitution was performed, but it is certain that neither Pickard nor anyone else intended to make any substantive change in the original Estate transaction.

On February 4, 1970, Pickard advised the Bank that loans on the books of the Corporation owing to Bateson, Bronson and the Estate had been capitalized in the following amounts: Bronson, $412,250.00; Bateson, $412,250.00; and Holmes and his Estate, $577,150.00.

Kiamie met with Bronson and Pickard on February 17, 1970. They agreed that Combustion's offer would be in common stock rather than preferred stock because Combustion did not have sufficient unissued authorized preferred stock available. Combustion lowered its previous evaluation of the Corporation's net assets, correspondingly reducing its offer, because the Corporation had provided for an inadequate reserve for taxes, and eliminated the Partnership from the transaction.

On March 3, 1970, the tentative agreement was further amended to eliminate 5,810 shares of common stock from the consideration to offset the retention by the Corporation of its debt to the Estate and to reduce the consideration by an additional 5,250 shares of contingent stock reserved for an incentive compensation fund for certain key Corporation employees. The agreement reached but not executed on March 3 provided that Combustion would transfer to Bateson and Bronson, in exchange for their shares of Corporation stock, a total of 24,240 shares of Combustion's common stock as the initial payment

and 24,000 shares as the contingent payment.

On April 29, 1970, Combustion executed an agreement with Bateson and Bronson pursuant to which it did deliver 24,240 shares of its common stock to them and placed 24,000 shares of its common stock in escrow, to be earned by them under a stipulated formula only if the Corporation had, after taxes, earnings in excess of $2,500,-000.00 during the period January 1, 1970 to December 31, 1974. On the same day, Bateson and Bronson entered into employment agreements with Combustion for the period through December 31, 1974. Bateson and Bronson received said 24,240 shares subject to an investment representation and agreement which provided that they were entitled at their request, at any time, to a registration statement for such shares, prepared and filed with the Securities and Exchange Commission at the expense of Combustion. This registration statement would enable Bateson and Bronson to sell publicly their Combustion stock. Finally, the agreement between Combustion and Bateson and Bronson recited that the Corporation retained in its treasury those 350 shares of stock formerly belonging to the Estate.

As of March 3, 1970, the date on which the principals fixed the number of Combustion shares to be given to or placed in escrow for Bateson and Bronson, the said shares were worth $2,808,562.23. The Court relies for this finding on the testimony of Pearson Hunt, Converse Professor of Finance Emeritus at the Harvard Business School. The market value per share of Combustion common stock for the week of March 3 averaged $92.44. Hunt's discount of 3% to take into consideration the size of the block of stock was appropriate. Accordingly, the 24,240 shares to be actually delivered had a fair market value of $2,173,-523.23. The 24,000 shares of contingent stock had a value in the Spring of 1970 of $635,039.00. The fact that Bateson and Bronson did not earn any contingent stock

does not diminish the significance of said stock as consideration in the transaction.

As of April 29, 1970, the date on which Combustion executed the agreement with Bateson and Bronson, Combustion shares had a market value of $78.75. Applying the aforementioned 3% discount, the fair market value on that day of the 24,240 shares delivered was $1,851,633.00. Since the value of the contingent stock was the same on April 29 as it was on March 3, 1970, the value on April 29, 1970 of all the stock designated as consideration was $2,486,-672.00.[1]

In July, 1970, Bronson, on behalf of the Corporation, wrote to Coffey offering to purchase for $417,000.00 the $581,603.62 note issued to the Estate by the Corporation six months earlier. Coffey, unaware of the terms of the Combustion acquisition, and concerned about the solvency of the Corporation, recommended acceptance of this substantial discount. On August 4, 1970, the Corporation and the Estate executed an agreement providing for the purchase of said note for $417,000.00 in cash.

Coffey, Mrs. Holmes and Radoccia learned of the terms of the transaction between Combustion and the individual defendants and Corporation from the plaintiffs' trial counsel in the Fall of 1972. Prior to that time they did not know the full nature of the activities of Bateson and Bronson and the Corporation during the period of Estate settlement negotiations.

## I.

### LIABILITY UNDER § 10(b) and RULE 10 b–5

■ Section 10(b) of the Act makes it unlawful "for any person, directly or indirectly", to "employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention" of any rule

---

1. Hunt also testified, based upon his analysis and expertise, that the value of the Corporation was $6,000,000.00 on January 6, 1970. He added that there would be no substantial difference

in that valuation if the date chosen for the fixing of value were several months earlier or several months later.

"the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." Among the rules prescribed by the Commission is Rule 10 b–5. Framing Rule 10b–5 in terms of a positive duty, a person, in connection with the purchase or sale of any security, is under an obligation to refrain from employing any device, scheme or artifice to defraud, or to otherwise engage in any act, practice or course of business which operates as a fraud or deceit upon any other. Such person must refrain from making untrue statements of material fact and should supply those material facts which are necessary in order to prevent statements made, in light of the circumstances, from being misleading.

■ It is well settled that a private right to relief from violations of these obligations is implicit in § 10(b) of the Act and Rule 10 b–5. *See, e. g., Affiliated Ute Citizens v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). In order to recover, the instant plaintiffs must establish the occurrence of a misrepresentation or omission made with scienter in connection with their sale of a security and the existence of a causal link between the misrepresentation or omission and their sale of said security.

■ Before turning to the issue of whether or not the plaintiffs have established these elements, the Court first addresses the contention of each of the defendants that any right to relief the plaintiffs might have had is barred by the applicable statute of limitations. Since the Act does not expressly provide a time limitation for civil actions under § 10(b), the defendants would have this Court apply to this action, by analogy, the one year limitation found in § 13 of the Securities Act of 1933, 15 U.S.C. § 77m. It is now beyond question, however, that the law of limitations of the forum state, rather than § 13 of the Securities Act of 1933, should be applied. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 210 n. 29, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Janigan v. Taylor,* 344 F.2d 781, 783 (1st Cir.), *cert. denied,* 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965).

■ Assuming that the defendants are correct in their assertion in the alternative that R.I. G.L. § 9–1–14, with its one year limitation on actions for words spoken, governs actions for oral misrepresentations, that provision is nevertheless inapplicable here. The plaintiffs alleged a pattern of misrepresentation and nondisclosure encompassing written documents and silence, as well as, oral statements. Thus, the controlling limitation is six years, as provided by R.I. G.L. § 9–1–13. *See Rusch Factors, Inc. v. Levin,* 284 F.Supp. 85, 88 (D.R.I.1968). Since this action was commenced in February, 1973, while all the challenged conduct of the defendants occurred after April 9, 1969, and was finally discovered in the Fall of 1972, it was timely filed.

### (a) SALE OF THE ESTATE'S INTEREST IN THE CORPORATION

### (1) CAUSATION

As noted above, the plaintiffs have the burden of establishing a causal link between their sale of the Estate's interest in the Corporation and a misrepresentation or omission by Bateson and Bronson. Each of the misrepresentations and omissions upon which the plaintiffs rely occurred between April 9, 1969, the date upon which Holmes died, and January 6, 1970, the date upon which the document evidencing said sale was executed. Among the defendants' contentions is that the said Partnership agreement of 1967 and a certain oral understanding reached by Holmes, Bateson, and Bronson, March 25, 1969, to handle a deceased's interest in the Corporation in a manner similar to the disposition of his interest in the Partnership, finally fixed the terms of the purchase of the Estate's interest in the Corporation. If the defendants' position is correct, then, naturally, nothing which occurred between April 9, 1969 and January 6, 1970 would matter and the Court's inquiry would be at an end. *See Radiation Dynamics, Inc. v. Goldmuntz,* 464 F.2d 876, 890 (2d Cir. 1972); *Pittsburgh Coke & Chemical Co. v. Bollo,* 421 F.Supp.

908, 923 (E.D.N.Y.1976). The Court, however, cannot accept this contention.

There is no reference made in the January 6, 1970 agreement finally settling the Estate's interest in the Corporation to any former Partnership agreement or any oral understanding between Holmes, Bateson and Bronson. This final settlement was the product of negotiations between the Estate representatives and Bateson and Bronson, as is acknowledged in the said preliminary agreement between them, entered November 26, 1969.

■ At any rate, even under the terms of the said Partnership agreement of 1967, the Estate representatives could enter into negotiations with the Corporation and the individual defendants and fix the value of the Estate's interest in the Corporation as of December 31, 1969, rather than as of the date of Holmes' death. Said Partnership agreement provided the surviving partners the option of entering into any "mutually satisfactory arrangements or agreement with the Estate of the deceased" partner.

The conduct of the parties, the language of the settlement agreements, and even the advice given by Pickard relative to Bateson's and Bronson's duty to disclose, make it overwhelmingly evident that the Estate was under no binding commitment to sell said stock on any particular terms until January 6, 1970. Bateson's and Bronson's obligation to disclose continued until that date.[2] The next issue is whether the individual defendants met this obligation to disclose fully, material information.

■ The "material" facts in this suit are those facts about the Corporation's business which in reasonable and objective contemplation might affect the value of its stock. See Rogen v. Ilikon Corp., 361 F.2d 260, 266 (1st Cir. 1966). Generally speaking, the test of materiality is an objective one, that is, whether a reasonable man would attach importance to the particular facts in controversy in determining his choice of action in the transaction in question. Id.; TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).

[9] The Court is convinced that Bateson and Bronson either failed to disclose or disclosed only in a partial and misleading way a number of material facts. Foremost among their material omissions was their failure to inform the Estate representatives of the existence and content of the extensive negotiations they had with Barry Wright after April 9, 1969. These negotiations reached such an advanced state that Barry Wright offered to acquire the Corporation for $4,800,000.00 in stock. Even apart from the offer, the strong interest in acquisition otherwise displayed by Barry Wright would certainly have been a factor affecting a reasonable man's decision in the Estate's position with respect to the transaction between it and the Corporation. See Rochez Brothers, Inc. v. Rhoades, 491 F.2d 402, 409 (3d Cir. 1974). The coinciding expressions of interest in acquisition by Combustion, Science Management and Barry Wright, together with the serious negotiations involving the latter two companies, indicated that a merger or acquisition on terms very favorable to the Corporation's stockholders was imminent. This fact was certainly material. See Thomas v. Duralite Co., 524 F.2d 577, 585 (3d Cir. 1975); SEC v. Geon Industries, Inc., 531 F.2d 39, 47–48 (2d Cir. 1976).

Bateson and Bronson also failed to disclose to the Estate representatives a considerable amount of financial data on the Corporation for periods between March 31, 1969 and January 6, 1970. The data received by Bateson and Bronson during that time revealed that the Corporation's business was continuing to increase and that the Corporation was earning substantial profits on an accrual basis. Most significantly, in August and September, 1969, the individual defendants were projecting 1969 accrual earnings for the Corporation of be-

---

**2.** Were this Court to determine that the parties committed themselves to the terms of the transaction on November 26, 1969, by said preliminary agreement, the result it would reach would be the same as that reached herein.

tween $650,000.00 and $900,000.00 and were evaluating the Corporation in excess of $6,000,000.00, primarily on the basis of financial reports not supplied to the Estate representatives.

Bronson's negative remarks concerning the financial health of the Corporation and the delivery to the Estate on January 6, 1970 of a statement showing the Corporation's cash loss for 1969 as $1,330,000.00 accentuated the materiality of this pattern of nondisclosure of financial data. Unquestionably, the Corporation suffered from cash flow problems in 1969. The Estate representatives knew this. Bateson and Bronson were aware that the Estate representatives were concerned that the Corporation's cash shortage would render it unable to adequately compensate the Estate for the sale of its interest in the Corporation. Bronson, by his negative remarks, Bateson, by his silence, and both of them by their selective disclosure of the said cash loss in 1969, encouraged that concern at the time when each possessed information that would have presented a far more balanced and promising picture of the Corporation's finances. That being so, the individual defendants' omissions and representations were misleading and material. *See Janigan v. Taylor, supra* ; *Myzel v. Fields,* 386 F.2d 718 (8th Cir. 1967), *cert. denied,* 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968); *Bowman & Bourdon, Inc. v. Rohr,* 296 F.Supp. 847 (D.Mass.), *aff'd per curiam,* 417 F.2d 780 (1st Cir. 1969).

■■■ To the extent the plaintiffs base this action on an affirmative misrepresentation by Bateson and Bronson, they must show that said misrepresentation was not only material, but also a substantial factor in determining the course of conduct which resulted in the Estate's loss. *See, e. g., Herzfeld v. Laventhol, Krekstein, Horwath & Horwath,* 540 F.2d 27, 33 (2d Cir. 1976). In contrast, to the extent the alleged violation of § 10(b) is premised on nondisclosure, positive proof of reliance is not a prerequisite to recovery; the existence of an obligation to disclose and the withholding of a material fact establish the requisite element of causation in fact. *Affiliated Ute Citizens v. United States,* 406 U.S. at 153–54, 92 S.Ct. 1456. In nondisclosure actions, a number of cases indicate that proof of materiality raises a presumption or inference of reliance or establishes causation prima facie, but that the defendants' proof of non-reliance defeats liability. *See Rochez Brothers, Inc. v. Rhoades,* 491 F.2d at 410; *Carras v. Burns,* 516 F.2d 251, 257 (4th Cir. 1975); *Chelsea Associates v. Rapanos,* 527 F.2d 1266, 1272 (6th Cir. 1975); *Blackie v. Barrack,* 524 F.2d 891, 905–908 (9th Cir. 1975), *cert. denied,* 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976). This Court agrees that in a nondisclosure case the defendants may defeat recovery by demonstrating that the plaintiffs' decision as to the transaction would have been no different had the material facts been disclosed.

■■■ Since the instant case is primarily one of nondisclosure, the plaintiffs have satisfied their burden of proving causation by showing the materiality of merger and acquisition negotiations and of financial data. The Court is completely satisfied with the inference that the plaintiffs would not have sold their 41.17% interest in the Corporation for $4,453.62 had they been aware that the Corporation was worth millions and that merger or acquisition was imminent.

The defendants, however, in an attempt to disprove this inference, contend that the plaintiffs were disinterested in the Corporation's merger or acquisition prospects and in its actual worth. The Court rejects this contention as unsupported by the evidence. The failure of the Estate representatives to more vigorously investigate the Corporation's financial condition and prospects for acquisition and merger is attributable to their belief that they had been given all the material information necessary to form a judgment, rather than to disinterest. This belief was understandable in view of the fiduciary relationship which existed between the individual defendants and the Estate and the longstanding association grounded on mutual trust existing between Coffey and the individual defendants.

Indeed, based on these relationships and the testimony of Coffey and Mrs. Holmes, the Court concludes that the plaintiffs established by positive proof of reliance a causal link between the Estate's sale of said stock and Bronson's negative remarks and the selective disclosure of the Corporation's cash loss for 1969. *See Janigan v. Taylor,* 344 F.2d at 786. Accordingly, the element of causation is established by direct proof as well as inference.

## 2. SCIENTER

Under the holding in *Ernst & Ernst v. Hochfelder, supra,* a defendant must possess scienter—the intent to deceive, defraud or manipulate—in order to be held liable under Rule 10 b–5. The evidence herein demonstrates a pattern of intentional deception on the part of the individual defendants.

On October 28, 1969, in reference to Bronson's contact with Combustion, Pickard accurately advised Bronson of the general obligation to disclose merger and acquisition negotiations, in language which clearly dictated disclosure of previous negotiations with Barry Wright and Science Management. Bronson informed Bateson of Pickard's advice. Said previous negotiations, however, were not disclosed to the Estate representatives or even to Pickard. Moreover, memoranda passing between Bateson and Bronson discussing the worth of the Corporation, *e. g.*, that of August 14, 1969, were marked "confidential" or bore the legend "keep under lock and key" and were kept in personal files. The nondisclosure of such items to the Estate was purposefully deceptive. On November 3, 1969, when the parties discussed the language to be employed in the final agreement, Bronson mentioned the prospects of merger in terms of future possibilities, totally concealing current negotiations at a time when it would have been most natural for one not intending to deceive to make a full disclosure. The record is replete with similar occasions which called for full disclosure; the calls went unheeded.

Bateson and Bronson had actual knowledge of the true financial condition of the corporation and of all of the efforts made toward arranging a merger or acquisition. They kept this information from the Estate representatives so as not to disturb their misapprehension of the Corporation's financial condition, especially its future ability to pay a substantial settlement to the Estate.

## 3. DUE CARE

The defendants contend that the Estate representatives failed to exercise due care in not actively investigating the Corporation's progress toward merger or acquisition and in inadequately analyzing the financial records available to them. According to the defendants, the plaintiffs are themselves responsible for any misapprehensions they may have had in respect to the Corporation's financial prospects.

The courts have employed different approaches in evaluating the conduct of plaintiffs in Rule 10 b–5 cases. *See* R. Wheeler, Plaintiff's Duty of Care Under Rule 10 b–5: An Implied Defense to an Implied Remedy, 70 N.W.U.L.Rev. 561 (1975). The defendants urge this Court to apply the standard of due diligence articulated in *Clement A. Evans & Co. v. McAlpine,* 434 F.2d 100, 104 (5th Cir. 1970), *cert. denied,* 402 U.S. 988, 91 S.Ct. 1660, 29 L.Ed.2d 153 (1971). Treating "due diligence" as a distinct element of the plaintiff's case, the Fifth Circuit announced in *McAlpine* a test which measures the plaintiff's conduct against that of a reasonable investor with the attributes of the plaintiff. Under that test one who acts negligently is not entitled to relief under Rule 10 b–5.

The Fifth Circuit, however, has recently relaxed its "due diligence" standard in response to the Supreme Court's holding in *Ernst & Ernst v. Hochfelder, supra,* which precludes the imposition of Rule 10 b–5 liability on defendants who act negligently but without scienter. In *Dupuy v. Dupuy,* 551 F.2d 1005, 1020 (5th Cir. 1977), the Court reaffirmed its approach of treating due diligence as a separate element, but stated the test as being whether

the plaintiff "intentionally refused to investigate 'in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow'. W. Prosser, [Handbook of the Law of Torts] § 34 at 185 (1971)". The Court explained by analogy that just as contributory negligence is not a defense in a tort action for intentional deceit, a due diligence standard framed in negligence terms is inapplicable in Rule 10 b–5 cases. *Accord, Holdsworth v. Strong,* 545 F.2d 687, 693 (10th Cir. 1976), *cert. denied,* 430 U.S. 955, 97 S.Ct. 1600, 51 L.Ed.2d 805 (1977). This conclusion is consistent with the fundamental purpose of the securities laws, articulated in *S.E.C. v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 186, 84 S.Ct. 275, 280, 11 L.Ed.2d 237 (1963), "to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry".

The First Circuit took a different approach in *Rogen v. Ilikon Corp., supra,* reversing a summary judgment entered for a defendant. In that case, decided prior to *Affiliated Ute Citizens v. United States, supra,* and *Ernst & Ernst v. Hochfelder, supra,* the Court linked the plaintiff's diligence to causation in examining the plaintiff's conduct to determine whether his reliance on misrepresentations was reasonable or justified.

 The instant plaintiffs have satisfied both the First Circuit's test in *Rogen v. Ilikon Corp., supra,* and that of the Fifth Circuit recently announced in *Dupuy v. Dupuy, supra.* The plaintiffs relied on Bateson and Bronson in lieu of conducting extensive investigations of their own, because of the long-standing, close professional and fiduciary relationships existing between the Estate representatives and the individual defendants. That reliance, reasonable under the circumstances, justified the level of care which the plaintiffs exercised. *See Holdsworth v. Strong,* 545 F.2d at 697; *Straub v. Vaisman and Co.,* 540 F.2d 591, 598 (3d Cir. 1976). Additionally, many of the undisclosed material facts concerned negotiations with Barry Wright and Science Management not reflected on the Corporation's books or were stated in confidential memoranda kept in the personal files of the individual defendants. The fact that the plaintiffs lacked effective access to information about the fraud undermines the defendants' position. *See, e. g., Rochez Brothers, Inc. v. Rhoades,* 491 F.2d at 409–10. It is no answer to contend that the Estate representatives simply failed to ask the right questions. *See Stier v. Smith,* 473 F.2d 1205, 1208 (5th Cir. 1973).

### 4. LIABILITY OF THE CORPORATION, BATESON and BRONSON

The Corporation negotiated with the Estate for the purchase of said stock through its agents Bateson and Bronson. Throughout the negotiation period Bateson was the Corporation's President and one of its two Directors; Bronson was the Corporation's Executive Vice-President and Treasurer and its other Director.

 Bound by the actions of Bateson and Bronson while transacting its business and being the actual purchaser of the Estate's stock, the Corporation is directly liable to the plaintiffs. *See Rochez Brothers, Inc. v. Rhoades,* 527 F.2d 880, 884 (3d Cir. 1975), *cert. denied,* 425 U.S. 993, 96 S.Ct. 2205, 48 L.Ed.2d 817 (1976); *SEC v. Lum's Inc.,* 365 F.Supp. 1046, 1061 (S.D.N.Y.1973). Here the Court notes that its decision does not directly affect innocent and unaware public stockholders of the Corporation, since upon completion of the Estate transaction, Bateson and Bronson held 100% of the outstanding shares of stock. The fact that title to said stock subsequently passed from the individual defendants to Combustion does not relieve the Corporation of its liability to the plaintiffs. Combustion took said stock knowing the terms of the transaction with the Estate and subject to claims arising therefrom in accordance with its agreement with Bateson and Bronson. *See Myzel v. Fields,* 386 F.2d at 749. Acquisition is not an avenue of escape from liability for a firm subject to a Rule 10 b–5 claim.

█ Though not purchasers of the Estate's stock, Bateson and Bronson are nevertheless individually liable to the plaintiffs. As officers, directors and stockholders, the individual defendants dominated the Corporation generally and engineered this deception of the Estate. Accordingly, they are "controlling persons" within the meaning of § 20(a) of the Act, 15 U.S.C. § 78t(a), *see Gould v. American-Hawaiian S. S. Co.,* 535 F.2d 761, 779 (3d Cir. 1976); *Lanza v. Drexel & Co.,* 479 F.2d 1277, 1299 (2d Cir. 1973), and are jointly and severally liable to the plaintiffs for any damages resulting from the aforesaid violations of § 10(b) and Rule 10 b–5.

## 5. COMBUSTION LIABILITY

The plaintiffs claim that Combustion "wilfully participated in a conspiracy" with or "aided and abetted" the other defendants in a violation of § 10(b) and Rule 10 b–5 making its liability equal to that of the other defendants.

█ In order to sustain a claim under the theory of aiding and abetting, one must prove that a violation of the securities law occurred, that the defendant had knowledge of the violation and that the defendant knowingly rendered substantial assistance to the primary violators. *See Landy v. Federal Deposit Ins. Corp.,* 486 F.2d 139, 162–63 (3d Cir. 1973), *cert. denied,* 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974); *Rolf v. Blyth Eastman Dillon & Co.,* 424 F.Supp. 1021, 1043 (S.D.N.Y.1977). A plaintiff can establish these elements by direct proof or by inference from parallel or complementary acts, prior relationships, common benefits, interchange of communications or other relevant factors. 2A Bromberg, Securities Law: Fraud § 8.5 at 581 (1973); *Zabriskie v. Lewis,* 507 F.2d 546, 554 (10th Cir. 1974).

█ Bateson, Bronson and the Corporation violated Rule 10 b–5, which satisfies the first element. As to the second element, the direct proof established little more than Combustion's awareness prior to January 6, 1970 that the Corporation was negotiating with an estate of a former part-

ner to acquire its interest in the Corporation. This falls far short of the kind of knowledge which is the key to liability for aiding and abetting—a defendant's knowledge of the violation and awareness of its role in the improper activity. *See Woodward v. Metro Bank,* 522 F.2d 84, 94–97 (5th Cir. 1975). Conceding the inadequacy of direct proof, the plaintiffs urge the Court to infer from all the circumstances that Combustion knew of and substantially assisted in the said improper activities. The record does not support these inferences.

The Court has intentionally characterized the meetings between the individual defendants and Combustion, prior to January 6, 1970, to the extent they dealt with acquisition, as "contacts" rather than "negotiations". These contacts may have been heartening and serious to Bateson and Bronson who viewed them in light of their current negotiations with other companies and their knowledge of the Corporation's attractiveness. On the other hand, the contacts were not so numerous, nor so formal that the Court will assume in the face of exclusively contrary testimony, that the conferees necessarily discussed the terms of the Estate transaction and the deceptions related thereto. In this instance the fact that Bronson had a prior relationship with Combustion militates against rather than in favor of an inference of culpable knowledge. It is entirely credible that Combustion and Bronson devoted most of their attention during their meetings in October, 1969, to the Great Lakes Carbon Corporation project on which they were collaborating. Through prior dealings, Combustion already knew, *e. g.,* the nature of the Corporation's services, its size and its reputation within its field. Combustion's initial interest in exploring the possible acquisition of the Corporation need not have been the product of detailed negotiations which would have exposed said improper activity.

Contrary to the plaintiffs' assertion, Bronson's telephone call on December 3, 1969, by which he advised Kiamie that the Corporation could begin discussions with Combustion the first week of January, did

not reveal anything of the wrongdoing of Bateson and Bronson. The fact that Combustion cooperated with Bateson and Bronson in postponing acquisition negotiations until after January 6, 1970 may have reflected an innocent and understandable desire on Combustion's part to avoid entanglement with the Estate settlement. Combustion may have merely acceded without motive to the wishes of Bronson who requested the postponement. Neither explanation gives rise to an inference that Combustion knew of the Rule 10 b-5 violation. In the absence of knowledge of a violation or a separate duty, Combustion was not under an obligation to become involved in the Estate transaction in order to protect the Estate.

Finally, there was nothing in any of the information on the Corporation's financial status which may have come to Combustion's attention prior to January 6, 1970 which would have revealed the existence of said violation.

There remain the plaintiffs' contentions regarding what transpired after January 6, 1970. First, the plaintiffs assert that Combustion's conditional offer to Bateson and Bronson made just one day following the closing of the Estate deal, indicates that more was afoot prior to January 6, 1970 than the testimony revealed. This position merits little discussion. Even if events after January 6, 1970 led this Court to believe Combustion's earlier interest in the Corporation was more serious than the testimony revealed, the record simply does not permit the further inference that Combustion had possessed knowledge of and intentionally assisted in the said violation.

The plaintiffs' second premise, that the familiarity with the terms of the Estate transaction, which Combustion gained after January 6, 1970, created an affirmative duty on Combustion's part to insure fair treatment for the Estate, must likewise be rejected. The actual sale of said stock by the Estate occurred on January 6, 1970. Combustion could not have knowingly sub-

stantially assisted in that violation solely by its actions after that date. This Court is unaware of any authority for the proposition that Combustion should have investigated the transaction and encouraged the Corporation to rescind its agreement with the Estate. Indeed, this would seem to place unfairly upon Combustion a greater burden of investigation than that placed upon the Estate representatives themselves. *See generally,* Ruder, Multiple Defendants in Securities Law Fraud: Aiding and Abetting, Conspiracy, In Pari Delicto, Indemnification and Contribution, 120 U.Pa.L.Rev. 597, 633 (1972).

 Similarly, the plaintiffs have failed to establish a case of conspiracy against Combustion. Central to a conspiracy is the existence of a knowing agreement among co-conspirators, the purpose of which is the consummation of an illegal act. *See Rochez Brothers, Inc. v. Rhoades,* 527 F.2d at 889. No evidence was produced from which the Court could infer such an agreement between Combustion and the other defendants.

### 6. ESTOPPEL, LACHES, WAIVER AND RATIFICATION

The defendants assert by way of affirmative defenses that the plaintiffs are barred from recovery in this action under the doctrines of estoppel, laches, waiver and ratification. The Court first addresses the issue of waiver which in this instance encompasses the principle of ratification.

The defendants contend that waiver was established by, *inter alia,* the receipt by the Bank, sometime after April, 1970, of figures showing the Corporation's financial picture at the close of 1969; the encouragement the Bank's Commercial Department offered the Corporation in its pursuit of acquisition by Combustion; the Estate representatives' knowledge of the fact of acquisition and of the fact Combustion supplied the funds to satisfy the Corporation's debt to the Estate; and, the delay in presenting any claim.[3]

---

3. The Bank was in the sensitive position of serving as coexecutor of the Estate and lender

to the Corporation. Radoccia, a Trust Officer, represented the Estate on behalf of the Bank.

Nothing which the defendants have shown, however, satisfies the key element of waiver—actual knowledge on the part of the plaintiffs of their right to relief from the wrongdoing of Bateson, Bronson and the Corporation. *See Royal Air Properties, Inc. v. Smith,* 333 F.2d 568, 571 (9th Cir. 1964).

■ Mrs. Holmes, Radoccia and Coffey did not learn of the terms of the transaction between Combustion and the individual defendants until so informed by the plaintiffs' trial counsel in the Fall of 1972. There was no evidence that the Estate representatives became aware of the full nature of the defendants' wrongdoing before the filing of the instant action, in February 1973. No actions were taken by the Estate representatives which expressly indicated or from which the Court could infer a waiver.

■ The Court also concludes that the evidence presented did not establish the defense of estoppel and that the plaintiffs are not guilty of laches, having pursued their claims with reasonable diligence.

### (b) ESTATE'S INTEREST IN THE PARTNERSHIP

The plaintiffs allege that Bateson and Bronson are not only liable under Rule 10 b–5 for their actions in connection with the Corporation's purchase of the Estate's stock, but also for their participation in the settlement of the Estate's interest in the Partnership. The defendants contend that said interest in the Partnership is not a security within the meaning of § 10(b).

The term "security" is defined in § 3(a)(10) of the Act as—

"any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit, for a security, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing . . . ."

The plaintiffs characterize the Estate's interest as an investment contract and thus a security under the test set out in *SEC v. W. J. Howey Co.,* 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244 (1946): "whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." The plaintiffs' position ignores the economic realities of the instant circumstances.

When the Corporation was organized, effective January 1, 1969, it took title to certain assets formerly belonging to the Partnership. The Partnership, retaining ownership of accounts receivable and rights to payment for work performed and unbilled as of December 31, 1968, became a liquidating entity. It had been, at all times relevant to this suit, a professional service organization governed by its general partners. Holmes contributed his personal efforts as a general partner, from which efforts came the profits which eventually formed the Estate's interest in the Partnership. There was no evidence that there were ever any limited partners investing in the Partnership. The Court emphasizes that the Partnership existed after December 31, 1968 merely to collect accrued profits; no new profits were being made.

As noted in *Vincent v. Moench,* 473 F.2d 430, 436 (10th Cir. 1973), cases in which partnership interests have been held to constitute securities commonly involve schemes in which a promoter sells undivided interests in a common enterprise to the public generally, retaining sole management and control of affairs of the enterprise. This case bears little resemblance to those cases in which limited partners have been held to possess a security by virtue of their non-control, investor status. *See generally, J.*

---

No one in the Commercial Department represented the Estate at any time and it is safe to assume that the encouragement was offered by the Bank through the Commercial Department in its capacity as a lender.

Long, Partnership, Limited Partnership and Joint Venture Interests as Securities, 37 Mo.L.Rev. 581 (1972); *Hirsch v. du Pont,* 396 F.Supp. 1214 (S.D.N.Y.1975), *aff'd,* 553 F.2d 750 (2d Cir. 1977).

The Partnership, already a liquidating entity, entered into a transition period upon the death of Holmes. The Estate sought and was entitled to nothing more than a pay out in an amount representing Holmes' interest in the Partnership. Under the circumstances, the settlement of this interest did not constitute the sale of a security within the meaning of the Act. *Compare Vincent v. Moench,* 473 F.2d at 436 *and United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975), *with SEC v. C. M. Joiner Leasing Corp.,* 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943).

Moreover, were the Court to reach the merits of this claim, it would hold that the plaintiffs failed to prove the aforementioned elements of a Rule 10 b–5 violation with regard to the settlement of the Estate's Partnership interest. Such misrepresentations and omissions as those relating to merger and acquisition negotiations and evaluations of the Corporation's finances were material to the worth of the stock in the Corporation, not the Partnership interest. The value of the Estate's interest in the liquidating Partnership was essentially fixed as of December 31, 1968, subject, of course, to the success of collections efforts. The cash flow and solvency of the Corporation were largely irrelevant since Bateson and Bronson as partners, not the Corporation, were to pay the Partnership debt to the Estate. The Court concludes that the evidence was insufficient to establish the existence of a culpable misrepresentation or omission or even that the payment established by the said January 6, 1970 agreement represented less than the fair value of the said Partnership interest.

## II.

### COMMON LAW LIABILITY

The plaintiffs' claims for relief under the common law merit only summary treatment since they are established on this record on much the same grounds that warrant relief under Rule 10 b–5.

In connection with the Estate's sale of its said stock, Bateson and Bronson, acting for themselves and the Corporation, knowingly created false impressions of material facts with the intention of having the Estate act on such impressions, which it did to its detriment without knowledge of the truth. This constituted fraud under Rhode Island law. *See, e. g., East Providence Loan Co. v. Ernest,* 103 R.I. 259, 236 A.2d 639 (1968); *O'Gorman v. Haber,* 50 R.I. 351, 147 A. 882 (1929); *Campanelli v. Vescera,* 75 R.I. 71, 63 A.2d 722 (1949). The individual defendants created the false impression that the Corporation was in serious financial trouble by words, selective disclosure of financial data and concealment of the Corporation's prospects for acquisition or merger. Fraud can be grounded in either affirmative acts or concealment. *Home Loan and Investment Association v. Paterra,* 105 R.I. 763, 255 A.2d 165 (1969).

Bateson and Bronson are also liable under the aforementioned facts for constructive fraud by virtue of their breach of fiduciary duty in connection with the Estate's sale of said stock. *See State Lumber Co. v. Cuddigan,* 51 R.I. 69, 150 A. 760 (1930); *Matarese v. Calise,* 111 R.I. 551, 305 A.2d 112 (1973). The individual defendants, as the sole directors and together as the majority stockholders of the Corporation, acted for their personal benefit, as well as, the benefit of the Corporation, in causing the purchase of said stock at a price less than its value. The Estate was a minority stockholder playing no significant role in the management or control of the Corporation.

Accordingly, the Court holds that under common law Bateson, Bronson, and the Corporation are liable for defrauding the Estate in connection with the Corporation's purchase of the Estate's stock. The Court concludes that the plaintiffs did not establish actual fraud or a breach of fiduciary

duty in connection with the settlement of the Estate's interest in the Partnership, nor did they prove that Combustion aided or abetted or engaged in a conspiracy with the other defendants to defraud the Estate.

## III.

## DAMAGES

### (a) COMPENSATORY DAMAGES

■ In Rule 10 b–5 cases, the measure of damages is the difference between the fair value of what the seller received and the fair value of what he would have received in the absence of fraudulent conduct, *Myzel v. Fields,* 386 F.2d at 748, except that when the defendant gains more than the seller's loss, damages are that portion of the defendant's profits as are not due to the defendant's own special efforts after the fraud occurred. *Affiliated Ute Citizens v. United States,* 406 U.S. at 155, 92 S.Ct. 1456; *Janigan v. Taylor,* 344 F.2d at 786.

On January 6, 1970, the plaintiffs received a seven-year, non-interest bearing note for the sum of $581,603.62. Of this amount, by the express terms of the settlement agreement, $4,453.62 represented the consideration given the Estate for the transfer of its 350 shares of common stock of the Corporation. The question is what was the fair value of the Estate's 41.17% interest in the Corporation as of January 6, 1970.

A number of factors have been considered in fixing the value of a corporation for purposes of determining damages in similar cases: the company's history and management, its operating expenses and earnings, the book value and adjusted book value of its shares, the selling price of its stock and its profit trends. *See, e. g., Kohler v. Kohler Co.,* 208 F.Supp. 808, 826 (E.D. Wis.1962), *aff'd,* 319 F.2d 634 (7th Cir. 1963); *Norte & Co. v. Huffines,* 288 F.Supp. 855, 858 (S.D.N.Y.1968), *aff'd,* 416 F.2d 1189 (2d Cir.), *on rehearing remanded to reconsider the award of prejudgment interest,* 416 F.2d 1191 (2d Cir. 1969), *cert. denied,* 397 U.S. 989, 90 S.Ct. 1121, 25 L.Ed.2d 396 (1970).

■ Professor Hunt, adequately taking these factors into consideration and applying an appropriate price earnings ratio to the Corporation's 1969 earnings, arrived at an estimated value for the Corporation on the date in question of $6,000,000.00. This evaluation is consistent with that of Bateson and Bronson reached in September, 1969, and with that of McGill who felt that the rejected tentative offer of $4,800,000.00 by Barry Wright was much too low. While Professor Hunt's conclusions were based on certain approximations, the fact of damages was established and any uncertainty as to the precise amount of damages in this case must be cast on the wrongdoers. *See Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 264–65, 66 S.Ct. 574, 90 L.Ed. 652 (1946).

The defendants point to the subsequent transaction between the individual defendants and Combustion as offering conclusive evidence of the worth of the Corporation. In that transaction Bateson and Bronson exchanged their shares of Corporation stock for Combustion stock. The defendants contend that the plaintiffs' damages should be the percentage of the Estate's interest in the Corporation (41.17%), multiplied by the dollar worth of said Combustion stock received by Bronson and Bateson on April 29, 1970, less the value received by the Estate for its stock.

The Corporation, however, retained its debt to the Estate after the acquisition by Combustion. The consideration paid Bateson and Bronson was reduced to reflect that fact. Certain contingent stock was set aside to establish stock options for employees and the said consideration was thereby reduced. Bateson and Bronson, therefore, could not have actually received a sum representing the entire value of the Corporation. Moreover, there is a likelihood that Bateson and Bronson overestimated the probability of their earning the contingent stock and were thus willing to accept Combustion's offer though it represented in fact an undervaluation of their interest in the Corporation. In late January or early Feb-

ruary, 1970, Bronson prepared a five year forecast of earnings for the Corporation (exhibit 56). If these projected earnings had materialized, Bateson and Bronson would have earned most or all of the contingent shares. On February 15, 1970, Bronson appraised the Combustion shares offered to him and Bateson at a value in the vicinity of $6,000,000.00 (exhibit 53). In the late Summer of 1970, Bronson remarked to Coffey that his and Bateson's "real money was coming in the earn-out". Additionally, the fact that the individual defendants were to become employees of Combustion may have affected them as to the number of shares they were willing to accept. See exhibit 30.

 The Court concludes that Professor Hunt's analysis offers a more accurate valuation of the Corporation's worth as of January 6, 1970 than the defendants' approach focusing on the Combustion transaction of April 29, 1970. The plaintiffs are entitled to 41.17% of $6,000,000.00, less the $4,453.62 which was the consideration fixed by the said Estate settlement agreement. The resulting sum is $2,465,746.38.[4] The plaintiffs additionally seek prejudgment interest at a rate of 8% from the date the complaint was filed, February 13, 1973. Interest on the judgment on the federal claim is given in the Court's discretion in response to considerations of fairness. *See Board of Commissioners v. United States,* 308 U.S. 343, 352, 60 S.Ct. 285, 84 L.Ed. 313 (1939); *Blau v. Lehman,* 368 U.S. 403, 414, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962); *Norte & Co. v. Huffines,* 416 F.2d at 1191. Prejudgment interest on the award on the pendent State claims would be governed by R.I. G.L. § 9–21–10, to which the plaintiffs have conformed their request. An award herein of prejudgment interest of 8% from the date of the filing of the complaint being equitable, the Court hereby makes such an award.

### (b) PUNITIVE DAMAGES

As part of their fourth claim for relief, the plaintiffs seek $1,000,000.00 in punitive damages, under Rhode Island law, from Bateson and Bronson.

The individual defendants contend that Sections 28(a) of the Act, 15 U.S.C. § 78bb(a), prohibits the award of punitive damages in any suit brought under the Act, whether or not State law applying to a pendent claim would otherwise permit such an award. Section 28(a) provides in pertinent part:

"No person permitted to maintain a suit for damages under the provisions of this chapter shall recover . . . a total amount in excess of his actual damages on account of the act complained of."

The individual defendants' position is supported by *Schaefer v. First National Bank,* 326 F.Supp. 1186, 1193 (N.D.Ill.1970), *appeal dismissed,* 465 F.2d 234 (7th Cir. 1972).

The majority rule, however, appears to be that while punitive damages may not be awarded in an action brought solely under Rule 10 b–5, *Green v. Wolf Corp.,* 406 F.2d 291, 302–03 (2d Cir. 1968), *cert. denied,* 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969), they are recoverable under state law when a state law violation is proven in conjunction with a Rule 10 b–5, *Flaks v. Koegel,* 504 F.2d 702, 706–07 (2d Cir. 1974); *Coffee v. Permian Corp.,* 474 F.2d 1040, 1044–45 (5th Cir.), *cert. denied,* 412 U.S. 920, 93 S.Ct. 2736, 37 L.Ed.2d 146 (1973); *Young v. Taylor,* 466 F.2d 1329, 1337–38 (10th Cir. 1972). Moreover, the Supreme Court in *Ernst & Ernst v. Hochfelder,* 425 U.S. at 210–11 n. 30, 96 S.Ct. 1375, 47 L.Ed.2d 668, implied that the above quoted § 28(a) would not bar the awarding of attorneys' fees in cases involving bad faith litigation, a punitive measure.

 It is the Court's belief that while it has the power to award punitive damages, this is an inappropriate case in which to do so. The Court first notes that the plaintiffs seek such an award as compensation. Under Rhode Island law, puni-

---

4. The plaintiffs are entitled to no greater amount of compensatory damages under state law than those awarded under Rule 10 b–5, therefore, the Court need not devote separate consideration to damages on the common law claims.

tive damages are awarded as a deterrent, not as compensation. *Norel v. Grochowski*, 51 R.I. 376, 155 A. 357 (1931). They are unnecessary in this case.

▬▬▬ Additionally, the malice, wantonness or wilfulness required of defendants as the basis for the award must be of an extreme nature, described in one case as amounting "to criminality, which for the good of society and warning to the individual, ought to be punished." *Adams v. Lorraine Mfg. Co.*, 29 R.I. 333, 338, 71 A. 180, 182 (1908). *Cf. Sherman v. McDermott*, 114 R.I. 107, 329 A.2d 195 (1974) (awarded in action for assault and battery and false imprisonment); *Smith v. Macomber*, 28 R.I. 248, 66 A. 570 (1907) (awarded in action for assault and false imprisonment). This degree of malice did not exist herein. The Court, therefore, will not award punitive damages.

## IV.

### CONCLUSION

Accordingly, the Corporation, Bateson and Bronson are judged to be liable jointly and severally to the plaintiffs for the sum of $2,465,746.38, plus interest at the rate of 8% from February 13, 1973. Judgment will enter for Combustion on the plaintiffs' claims against it. No attorneys' fees are awarded. Counsel for the plaintiffs will prepare and submit for entry an order in conformity with this opinion.

### SUPPLEMENTAL OPINION

This matter is again before this Court on the plaintiffs' motion for reconsideration of that part of this Court's opinion of July 6, 1977 which deals with the computation of prejudgment interest awarded to the plaintiffs. In that opinion this Court ruled that the plaintiffs were entitled to damages in the amount of $2,465,746.38 plus interest thereon at the rate of 8% from February 13, 1973, the date of the commencement of this action. This award was in accordance with what this Court believed to be a proper award for interest.

By their motion the plaintiffs have brought to this Court's attention that Rhode Island General Laws § 9–21–10, which controls the calculation of prejudgment interest on the non-federal claims involved in this action, was amended effective March 21, 1977, to change the starting date for the period of interest from the date of the commencement of the action to the date the cause of action accrued. Said section 9–21–10, as amended, effective March 21, 1977, states:

> Section 1. Section 9–21–10 of the General Laws in Chapter 9–21 entitled "Judgments, orders, and decrees" is hereby amended to read as follows:
>
> 9–21–10. *Interest in Civil Actions.*—In any civil action in which a verdict is rendered or a decision made for pecuniary damages, there shall be added by the clerk of the court to the amount of damages, interest at the rate of eight per cent (8%) per annum thereon from the date *the cause of action accrued* which shall be included in the judgment entered therein. This section shall not apply until entry of judgment or to any contractual obligation where interest is already provided or as to any condemnation action. (Emphasis supplied).
>
> Section 2. This act shall take effect upon its passage.

▬▬▬ The plaintiffs contend that pursuant to said act as amended, prior to the rendition of this Court's opinion in this action on July 6, 1977, prejudgment interest must be calculated from January 6, 1970, the date upon which the plaintiffs' cause of action accrued. This Court agrees with this contention.

While the Supreme Court of Rhode Island has not as yet addressed the issue as to whether said 1977 Amendment to R.I.G.L. § 9–21–10 should be applied to actions filed before but decided after its enactment, decisions of that Court interpreting earlier versions of Rhode Island's prejudgment interest statute are in my opinion dispositive of that issue. In *Foster v. Quigley*, 94 R.I. 217, 179 A.2d 494 (1962) the Supreme Court directed that interest be calculated from

the date of the commencement of said action pursuant to a statutory provision which had been enacted subsequently to the commencement of said action. The Supreme Court stated in its opinion:

"Interest on a judgment in an action of trespass or trespass on the case for damages to person or property is not of the substance of the right of action but exclusively an incident attached thereto by legislative fiat after such right has been adjudicated. The period for computation of such interest is in the same category.

. . .

Here of course it is not a question of whether the legislature could make the provision for interest computable from the date of a writ commencing an action before the enactment of the statute but whether it intended to have its fiat thus applied. Its language readily responds to the time of decision or verdict. For this reason we construe the statute as intending to become operative *in any case where a decision is made or verdict rendered after its enactment irrespective of the time when the action was commenced.* Hence, the trial justice erred in refusing to order the addition to the judgment of interest from the date of the writ." *Foster v. Quigley,* 94 R.I. 217 at 218, 219, 179 A.2d at 495, 496 (1962). (Emphasis supplied).

Contrary to the defendants' contention, the fact that the Supreme Court in *Foster v. Quigley, supra,* analogized interest to costs does not render the language therein inapplicable to the imposition of interest for a period prior to the commencement of an action. As explained in *Perri v. Wood,* 103 R.I. 53, 56, 234 A.2d 663, 665 (1967), by its analogy the Supreme Court was simply making the point that neither interest nor costs were recoverable unless authorized by legislative fiat.

Decisions of the Supreme Court of Rhode Island following *Foster v. Quigley, supra,* clearly hold that prejudgment interest statutes neither enlarge nor impair substantive rights but prescribe the methods and procedures for enforcing such rights. *See Kastal v. Hickory House, Inc.,* 95 R.I. 366, 187 A.2d 262 (1963); *Isserlis v. Director of Public Works,* 111 R.I. 164, 300 A.2d 273 (1973); *Norton v. Paolino,* 113 R.I. 728, 327 A.2d 275 (1974). *See also Oresman v. G. D. Searle & Co.,* 388 F.Supp. 1175 (D.R.I.1975). It is the opinion of this Court that the Supreme Court of Rhode Island, consistent with these decisions, would consider R.I.G.L. § 9–21–10, as presently enacted, procedural and remedial in nature and hence applicable to actions pending on the date of its enactment.

Accordingly, said opinion of July 6, 1977 in this action is hereby modified to provide for the imposition of prejudgment interest on the award on the non-federal claims at the rate of eight per cent (8%) per annum from January 6, 1970. Additionally in its discretion, this Court awards interest at the same rate on said federal claims from January 6, 1970, it being of the opinion that such an award is fair and equitable under the circumstances of this case.

Counsel for the plaintiff will prepare and present for entry an order in conformity with this opinion and said opinion of July 6, 1977 as herein modified.