99 N.J. Super. 463 (1968)
240 A.2d 434
JAMES L. JOHNSON, PLAINTIFF-RESPONDENT,
v.
METROPOLITAN INSURANCE COMPANY, A NEW YORK CORPORATION, DEFENDANT, AND PROGRESSIVE LIFE INSURANCE COMPANY, A NEW JERSEY CORPORATION, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued January 29, 1968.
Decided February 23, 1968.
*466 Before Judges GOLDMANN, KILKENNY and CARTON.
Mr. Burton L. Fundler argued the cause for appellant (Messrs. Mirne, Nowels, Fundler & Cornblatt, attorneys).
Mr. Eugene T. Radeliffe argued the cause for respondent (Messrs. Powell and Davis, attorneys).
The opinion of the court was delivered by KILKENNY, J.A.D.
This is an appeal by defendant Progressive Life Insurance Company from a judgment in the amount of $8,021.81 in favor of the substituted plaintiff Katherine F. Johnson, executrix of the estate of James L. Johnson. Decedent had instituted suit in his lifetime to recover benefits claimed to be due him under a lifetime disability policy issued by Progressive to him on December 13, 1961. He died before trial and his personal representative was substituted as plaintiff.
Another suit against Metropolitan Life Insurance Company is not involved in this appeal. There was a stipulation of dismissal as to it.
A full recital of the facts is necessary for an understanding of the issues involved.
As noted above, the policy upon which suit was based was issued on December 13, 1961. The insured, James L. Johnson, in his written application for the policy gave answers to questions therein as follows:
"10. Have you ever been treated for, or ever been told that you had any one or more of the following:
* * * Heart Disease? No.

* * * * * * * *
13. Have you consulted a physician or other practitioner within the past five years or to the best of your knowledge and belief have you had any illness or disease not mentioned in the answers above? Yes [X], No [].
*467 REMARKS:- Give full details including names and addresses of attending physicians, dates and reasons when any questions 8 through 13 are answered `Yes.'
No. 13  July 1961 Hydrocele removed surgical. Loss of time about 6-8 weeks. Complete rec. R. Gove, M.D. Brant Beach, N.J.

* * * * * * * *
15. Do you represent that the above answers are true and complete to the best of your knowledge and belief and do you agree (1) that the falsity of any answer in this application shall void the policy, if such answer materially affects either the acceptance of the risk or the hazard assumed by the Company, (2) that the insurance, if issued, shall take effect on delivery of the policy and payment of the first premium during your good health, but only if no change shall have occurred in your insurability since the completion of this application? Yes."
The application was dated December 13, 1961 and signed by Johnson before a licensed agent of defendant insurance company.
On August 5, 1963 Johnson became totally disabled within the terms and meaning of the policy in question. He was then admitted to Temple University Hospital in Philadelphia, suffering from Alzheimer's disease. Thereafter he submitted a claim for permanent disability benefits under the policy. A routine investigation was made by defendant. An examination of the hospital records from the time of his admission revealed to defendant for the first time that Johnson had at the time of his application for the insurance and for several years prior thereto a medical history of coronary insufficiency. Johnson himself supplied this history to the hospital authorities. This history manifested that his answers on the application, as noted above, were false and incomplete. Defendant deemed his representations to be not only false and incomplete, but also such as to have materially affected its acceptance of the risk and the hazard assumed by it. Details thereof are noted infra.
Defendant notified Johnson by letter of October 16, 1963 of its election to declare the policy void, enclosing therewith *468 a check refunding all premiums paid. The present action followed.
Trial of the cause was before a jury and it returned a verdict in plaintiff's favor. The jury answered by an 11-to-1 vote in the negative the following special interrogatory:
"Did Mr. Johnson have a heart disease including a coronary insufficiency or a cardiovascular illness at any time during the period November 19, 1957, through May 23, 1959?"
In another special interrogatory the jury was asked:
"What is the amount of damages that the plaintiff is entitled to under the policy of insurance  $5762.31 or $8021.81?"
Its answer, by a 10-to-2 vote, was $8,021.81.
Judgment was entered on the basis of the verdict. Defendant moved for judgment in its favor, notwithstanding the verdict. The motion was denied, as had its earlier motions for judgment in its favor. This appeal followed.
Defendant's main argument is that its several motions for judgment in its favor, during and after the trial, should have been granted on the basis of the insured's material misrepresentations in his application for the policy in question. In appraising that contention the following additional facts must be noted.
On November 19, 1957 Johnson, the insured, consulted his family physician, Dr. Richard Gove, complaining of fatigue and pains in his chest. He saw Dr. Gove again for chest pains and distress on December 3rd, 13th and 27th, all in 1957. He was physically examined and was given an electrocardiogram. Dr. Gove interpreted the EKG "as suggestive of coronary insufficiency." The doctor recommended the taking of peritrate. This is a vessel-dilating drug, used primarily for coronary diseases. Mrs. Johnson admitted in her testimony that her husband told her in 1957 that Dr. *469 Gove said he might have a "heart condition." Dr. Gove testified that he told Johnson of his finding of coronary insufficiency. Johnson was told "that he should refrain from working, for a while, which he did, I'm sure." Dr. Gove testified that Johnson "had a cardiac pain, which would mean his chest, in the area that would probably cause this." The coronary insufficieny itself, according to the doctor's testimony, "`is more of a symptom, really, than it is specifically a disease. * * * The coronary vessels are not getting sufficient blood supply, is what it means." Johnson's distress persisted and Dr. Gove advised him to see a specialist.
On May 5, 1959 Johnson desired another doctor's opinion and consulted Dr. George J. Slotoroff. He saw this doctor also on May 12th and 23rd. The doctor examined the insured electrocardiographically and found him negative as far as coronary artery disease. A chest x-ray, taken by a Dr. Willner, proved negative. The doctor told Johnson that "he had no coronary artery disease * * * and convinced him that he could do his active work without any problem." We note that Dr. Slotoroff was graduated from a school of osteopathy, as opposed to a general medical college, but his license entitles him to practice medicine in New Jersey. He is, admittedly, not a heart specialist. He did not recall Johnson's complaints when he came to his office in 1959, and he had no records as to his clinical findings. He was aware, however, that Johnson had been treated by medication, "peritrate," for a year and a half prior to his examination.
In answering the questions in the December 1961 insurance application, the insured failed to disclose his having consulted Dr. Gove or Dr. Slotoroff in 1957 and 1959, respectively, for the purposes above noted. His only disclosure of having consulted any physician during the five years preceding the application was tersely set forth, as noted above:
"July 1961 Hydrocele removed surgical. Loss of time about 6-8 wks. Complete rec. R. Gove, M.D. Brant Beach, N.J."
*470 That disclosure related only to a relatively immaterial surgical incident, considering that he fully recovered therefrom. A "hydrocele" is an accumulation of serous fluid in a sacculated cavity, specifically in the scrotum.
Nor did Johnson, as applicant for a policy, disclose that on October 27, 1961, less than two months before he signed the application, he again consulted Dr. Gove and "complained of pains in his chest." The doctor then gave him medication "for chest pains," viz., codeine and papavarine, which the doctor testified "was primarily for cardiac distress."
It was Dr. Gove who referred Johnson to Temple University Hospital on August 5, 1963, where he was placed in the care of Dr. Murtagh. The hospital records are very revealing. Under "Personal History," Johnson stated that "3-5 yrs ago had `Heart attack' and nervous breakdown." Reference is also made to "1961  Hydrocele operated on." The person who took the history noted "patient gives vague hx [history]." Dr. Murtagh noted that there was a "possible cardiac problem several yrs. ago."
We are not unmindful of the fact that Johnson was suffering from Alzheimer's disease when he entered the hospital. His mental acuity was affected and he needed assistance to walk to the ambulance. This disease is a progressive deterioration of mental and physical motor ability. It is caused principally by arteriosclerosis, or hardening of the arteries in the brain, thus preventing the proper vascular supply needed for complete and efficient cerebral activity. Once started, it is an irreversible process and ultimately leads to death, as it did here. The early symptoms are headaches and loss of motor ability  here, in the forms of bilateral frontal head pain, right-side paralysis and slurred speech. This indicated that the first affected areas were in the left side of the brain, with some right-side involvement. The pathogen has not been identified, but it is clear that this vascular condition is not related to heart disease.
*471 Johnson was operated on at the hospital (bilateral brain biopsy) and the suspicion of Alzheimer's disease was confirmed. The operation is diagnostic only. No treatment is available for this disease. After the operation he was taken home. His condition never significantly improved before he began his final decline. He was confined to a wheelchair and was wheeled to football and basketball games occasionally. However, he was paralyzed and unable to attend to his own needs and became dependent on others. As noted above, he died in May of 1966.
The trial court properly observed that the insured had "not fully and completely answered" question number 13 in the application because he made no mention of having seen Dr. Gove, who diagnosed his chest pains in 1957 as being due to coronary insufficiency and told Johnson so at that time. Nor did he disclose that he had seen Dr. Slotoroff in 1959 for his opinion as to his condition. As the trial judge expressed it:
"* * * certainly there was a non-disclosure of any treatment of any vascular condition, if we characterize a coronary insufficiency not a heart disease, but as a vascular condition. There is no mention of Doctor Gove having treated the decedent for a two-year period, nor is there any reference to Doctor Slotoroff there [in the application]. And it is obvious that the applicant is incorrect. What the effect of it is legally, I am not going to rule."
The trial court told the jury that it need not decide whether there was a misstatement, "because the Court has already so determined that fact as a matter of law from the testimony."
We shall assume from the conflicting medical testimony that there was sufficient evidence to support the jury's finding that Johnson did not suffer from heart disease or coronary insufficiency when he applied for the insurance policy in December 1961. We shall also assume that the cause of his death was Alzheimer's disease, unrelated to heart disease or coronary insufficiency.
*472 The uncontroverted facts remain that Johnson was examined by his family physician for fatigue and pains in the chest on several occasions between November 1957 and October 1961; his condition was diagnosed by his family physician as being one of coronary insufficiency; he was so told by his doctor and he, in turn, told his wife; he received medication, in the form of peritrate, a drug used primarily for that condition; he sought the opinion of another doctor in 1959, who found him negative for coronary insufficiency; but, two months before making his application in 1961 for the insurance policy, he was back in the office of his family physician with chest pains for which drugs were prescribed on the theory that the pains were "cardiac" in nature. Yet, the insured disclosed none of this information in his application in response to questions specifically directed toward eliciting it. The trial judge found as a matter of law that Johnson had made a "misstatement" in his application for the policy, as noted above.
In the light of these uncontradicted proofs, the trial court should have granted defendant's motions for judgment in its favor. Certainly, the nondisclosure by Johnson in his answer to question 13 of the application of facts material to defendant's "acceptance of the risk" and of "the hazard assumed by the Company" was tantamount to a "fraudulent misstatement," at least in an equitable sense, on his part. He took pains to recite the hydrocele operation from which he had completely recovered. Yet, he failed to reveal his consultations with two doctors as to chest pains of long duration, his family physician's diagnosis and medications prescribed, the electrocardiograms and the x-rays.
Silence as to a material fact is not necessarily equivalent to a false representation. But mere silence is quite different from concealment. Aliud est tacere, aliud celare. A suppression of the truth may amount to a suggestion of falsehood. Stewart v. Wyoming Cattle Ranche Co., 128 U.S. 383, 388-389, 9 S.Ct. 101, 32 L.Ed. 439 (1888).
*473 The issue was not solely whether the applicant had heart disease or coronary insufficiency when he applied for the policy. Question 10 inquired whether he had ever "been treated for, or ever been told" that he had "heart disease." He had been treated for and told that he had coronary insufficiency. Nor is it crucial that his death was due to Alzheimer's disease, unrelated to heart disease or coronary insufficiency. Rather, the issue is whether Johnson's false, because incomplete, answers to the questions in the application were material to defendant's "acceptance of the risk" or assumption of the hazard. Obviously, the insurance company had the right to a full disclosure and the option, based thereon, to accept or reject Johnson's application. The failure to make full and honest disclosure prejudiced it into accepting a risk without further examination. Its position has been that it would not have issued this policy to Johnson, if the questions in the application had been fully and correctly answered.
The trial judge told the jury that "if the insurance company was not prejudiced or they [the misstatements in the application] were not material to the risk, then that would not be a basis for the insurance company setting aside this policy." He then limited the issue, stating
"* * * the only question in this connection that has to be determined, which is a question of fact, is whether or not Mr. Johnson did in fact have this condition during the period aforesaid; * * *."
This was one of the two interrogatories to be answered by the jury. As to this question, the jury was instructed to answer "yes or no." The jury was then reminded of the conflicting medical testimony.
We find that it was error to submit the case to the jury on that limited basis. It disregarded the materiality of the nondisclosure of pertinent information bearing upon defendant's right to "accept" the risk. In effect, the jury was told that defendant would be prejudiced by the false answers *474 only if the insured did not have heart disease or coronary insufficiency.
"An insurance contract is preeminently one of the utmost good faith. * * * The insurance company customarily relies on the truthfulness of the insured's rendition of his medical history." Equitable Life Assur. Soc. of United States v. New Horizons, Inc., 28 N.J. 307, 312 (1958). "Innocent material misrepresentations will, in equity, support rescission of an insurance contract. Scienter is not an essential element of equitable fraud." Id., at p. 314.
The prior medical history of an applicant is naturally and logically a most material matter to an insurance company, "and the working rule is that inquiries propounded in the application form, and the truthfulness and completeness of answers thereto touching the physical condition and pathological history of the applicant, are material to the risk as a matter of law and such materiality is not the subject of a finding of fact by a jury." Gallagher v. New England Mutual Life Ins. Co. of Boston, 19 N.J. 14, 21 (1955). To the same effect, see Kerpchak v. John Hancock Mutual Life Ins. Co., 97 N.J.L. 196, 198 (E. & A. 1922); Urback v. Metropolitan Life Insurance Co., 127 N.J.L. 585, 586 (E. & A. 1942). The insurance company bargains for full and truthful disclosure, so that it may investigate the risk and determine ultimately its acceptance or rejection.
The falsity of any statement in the application for a policy may not bar the right to recover thereunder unless such false statement materially affected either the acceptance of the risk or the hazard assumed by the insurer. N.J.S.A. 17:38-13.4(C).
"The most generally accepted test of materiality is whether or not the matter misstated could reasonably be considered material in affecting the insurer's decision as to whether or not to enter into the contract, in estimating the degree or character of the risk, or in fixing the premium rate thereon." 12 Appleman, Insurance Law & Practice, § 7294, p. 403. *475 We follow that test. Metropolitan Life Ins. Co. v. Lodzinski, 122 N.J. Eq. 404, 408 (E. & A. 1937); Kerpchak v. John Hancock Mutual Life Insurance Co., 97 N.J.L. 196, 198 (E. & A. 1922).
Johnson's chest pains were not some transitory or temporary indispositions. They had been diagnosed as being due to coronary insufficiency. His doctor told him so and treated him for that condition. There were several visits, the last only two months before his application. Nondisclosure was material under the circumstances.
Plaintiff argues that the incontestability clause in the policy barred defendant insurance company from contesting the statements contained in the application. That clause provides:
"TIME LIMIT ON CERTAIN DEFENSES:
(a) after two years from the date of issue of this policy no misstatements, except fraudulent misstatements, made by the applicant in the application for such policy shall be used to void the policy or to deny a claim for loss incurred for disability (as defined in the policy) commencing after the expiration of such two-year period." (Italics ours).
Plaintiff claims that the trial court erroneously denied her request to charge the jury that if it found "an absence of intentional fraud, then it should return a verdict for the plaintiff."
The trial court properly denied this request because the reference to "intentional fraud" was conjoined in the request with other language equating "intentional" with "knowingly." For example, the following was included:
"The defendant insurance company must show you by clear and convincing proof that Mr. Johnson knew that the fact represented to be true was false, or that the fact concealed was a fact known to him." (Italics ours).
Scienter is necessary for legal fraud, but it is not a requirement of equitable fraud.
The incontestability clause expressly excluded from the two-year limitation "fraudulent" misstatements. This *476 included those equitably fraudulent as well as those legally fraudulent. Therefore, Johnson's materially false representations in the application, upon which he intended the insurance company to rely, as it did, were fraudulent in the equitable sense, even if it were found that he acted innocently and without knowledge as to the falsity.
Moreover, defendant insurance company notified Johnson by letter of October 16, 1963  about two months after his total disability began on August 5, 1963, upon his making claim  that it was disclaiming liability because of his answers to the questions on the application. It returned its check to his order for $428.60, a "return of all premiums that you have paid." It was Johnson who waited until July 29, 1965 to file his complaint, which defendant answered shortly thereafter. The disability herein did not commence after the expiration of such two-year period, as the clause provides, but before its expiration.
Under all the circumstances, the incontestability clause in this policy did not bar defendant from raising the defense of materially false representations by the insured in the application.
Nor did the trial court err in rejecting the plaintiff's proffer of proof that the agent for the insurance company filled out the application after Mr. Johnson had told him of his medical consultations. Such an attempted avoidance of the defense of fraud was not pleaded in a reply or raised in the pretrial order. It was not an abuse of the trial court's discretion to disallow this new factor to be asserted during trial.
Our decision in favor of defendant makes it unnecessary to decide other points advanced by it for reversal. However, for the sake of completeness we shall dispose of them briefly.
Plaintiff concedes that the trial court erred with respect to the payment of compound interest. Hence, we need not consider that point.
The trial court properly instructed the jury that the burden of proving the affirmative defense of fraud was *477 on defendant insurance company "and under our law this must be proven by clear and convincing evidence, which means more than a preponderance of evidence. It has been defined in our State as clear, satisfactory and convincing evidence." Our cases so hold. Wiley v. Wirbelauer, 116 N.J. Eq. 391, 396 (Ch. 1934); Bell v. Merchants Bldg. & Loan Ass'n, 132 N.J. Eq. 356, 361 (Ch. 1942).
If plaintiff had been entitled to a recovery, it would have been proper to submit to the jury for its determination whether plaintiff's claim was for a "Confining Sickness" under section 3(a), for which $200 monthly is payable for the duration of the sickness, or for a "Non-confining Sickness" under section 3(b) of the policy, under which the $200 monthly is limited to 24 months for any one sickness. The evidence, though strongly persuasive of a conclusion that the sickness was of a "confining" character within the reasonable interpretation of the policy, as the jury found, did raise a factual issue for jury determination. Plaintiff does not complain of the submission of this issue to the jury. It cannot be said as a matter of law that the sickness was "non-confining" merely by reason of Johnson's being wheeled out-of-doors on a few isolated occasions. This phase of the case related to the issue whether plaintiff was entitled to the larger sum of $8,021.81 or the smaller sum of $5,762.31 in the event of a recovery. The jury's award of the larger sum reflected its finding that the sickness was "confining." There was adequate evidence to support that finding.
The submission to the jury for special factual finding as to whether the insured had a heart disease, including a coronary insufficiency or cardiovascular illness, at any time during the period November 19, 1957 through May 23, 1959, was proper insofar as its finding would resolve that factual question and help to determine the defense of fraud. The jury's negative answer, however, would not derogate from defendant's right to rescind the policy and avoid liability thereunder by reason of the materially false answers in the application.
*478 The judgment in favor of plaintiff is reversed. The matter is remanded to the trial court for entry of a judgment in favor of defendant Progressive Life Insurance Company.