255 A.2d 165.

HOME LOAN AND INVESTMENT ASSOCIATION *vs.*
JOHN J. PATERRA.

JULY 2, 1969.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

764

JOSLIN, J. This civil action was brought in the superior court by the payee against an accommodation maker to recover the unpaid balances due on two negotiable promissory notes. A trial justice sitting without a jury determined that the plaintiff had failed to advise the defendant about certain relevant and material facts concerning the loan transactions, treated the concealment of those facts as equivalent to fraud, and found for the defendant for whom judgment entered. The plaintiff appeals.

The facts are not in dispute and can be briefly stated. In November 1964, Ernest Petteruti applied to plaintiff for a loan. Ernest's health was poor, he was heavily in debt, and he was in dire need of financial assistance. Obviously, he was a poor credit risk and plaintiff was unwilling to lend him any money without the protection of the signature of a substantial endorser or co-maker. Ernest then went to defendant, told him of his difficulties, and asked him to guarantee the loan. He suggested that defendant communicate with Joseph Petteruti (Ernest's nephew and plaintiff's president) in order to verify his circumstances and the arrangements he had made concerning the proposed loan. The defendant complied with Ernest's suggestion and telephoned Joseph. What Ernest had told him was confirmed. Joseph

was aware that Ernest had financial problems and that he was a poor credit risk; he knew that Ernest in the past had failed to keep his financial commitments and that he would be unable to pay the proposed loan; and he was unwilling to lend him any money unless a substantial guarantor could be found. When defendant asked whether the loan would be covered by life insurance, Joseph replied that it would be. Feeling secure in the belief that the insurance proceeds would be available to meet any obligations on the loan "in the event that anything happened" to Ernest, defendant then became a co-maker on a note for $1,097.16. It was dated November 24, 1964, and called for 12 equal monthly payments of $91.43 each.

About a month later Ernest again approached defendant. He was still in pressing need of money and asked defendant to sign for him so that he might obtain an additional loan from plaintiff. Once again defendant telephoned plaintiff, asked whether Ernest's life would be insured, and was told that it would be. Notwithstanding that assurance, he was reluctant to sign. His reason was that he thought it unfair for Ernest to ask him, a "perfect stranger," to endorse his obligation at a lending institution which was controlled and owned by the borrower's family—the Petterutis. His misgivings were satisfied when both Ernest and Joseph assured him that Mary Petteruti, Joseph's mother and Ernest's sister-in-law, would also sign. The second note was executed on December 16, 1964, and defendant and Mary Petteruti were co-makers. The note was in the principal amount of $1,134.18, and provided for 18 equal monthly payments of $63.01 each commencing on January 16, 1965. Neither in this instance nor at the time of the first transaction was defendant shown a copy of the insurance contract, and while this note, just like the earlier one, indicated that life insurance would be carried on the loan, it did not disclose the extent of the coverage.

Ernest died in July or August of 1966. No payments had then been made on either note. Although defendant had been notified during Ernest's lifetime that the notes were in default, he had not been dunned for payment, and indeed, it was not until six months after Ernest's decease that a serious demand was made upon him for payment. By then ownership and control of plaintiff had passed from the Petteruti family.

The controversy centers on what was meant and what was understood when defendant asked whether life insurance would be carried on the loan and was told that it would be. There are two versions. The defendant's is that he would not have become a co-maker unless the loans were covered by life insurance. Life insurance coverage to him meant that the insurance proceeds would be available to pay whatever balances might be due on the two notes whenever Ernest died. If that were not so, he said, it would have been foolish for him to sign knowing that Ernest was in poor health and that he would be unable to pay the installments on the notes as they fell due.

Joseph, in his version, does not deny that he told defendant that Ernest's life would be insured, but he says that the kind of insurance he was talking about and the kind actually carried was what is known in banking circles as credit group life insurance. That type of insurance, he testified, does not cover whatever may be owing on an obligation at the time of a borrower's death, but covers only such amounts as are not then in default. In this case, of course, all of the installments on each of the obligations had matured and were in default when Ernest died, and therefore, there were no insurance proceeds available to pay what was then owing on the two notes.

The decisive question is whether plaintiff, in the light of all the circumstances, had an obligation to disclose to defendant the particular kind of life insurance it proposed

to carry on the loans and to explain to him the limited coverage that type of insurance provided.

The plaintiff relies on the general rule that one party to a transaction is under no duty to speak out to the other concerning everything he knows about the matter, and that silence, even if meditated and upon a material fact, will not necessarily allow the other party to the transaction to set it aside as fraudulent. See *Fisher* v. *Budlong,* 10 R. I. 525; *O'Leary* v. *Tillinghast,* 22 R. I. 161, 46 A. 754. It argues, moreover, that the existence of fraud is a question of fact, *Thornley Supply Co.* v. *Madigan,* 48 R. I. 271, 137 A. 385, which must be clearly proved, *Cliftex Clothing Co.* v. *DiSanto,* 88 R. I. 338, 148 A.2d 273; *Simeone* v. *Prato,* 82 R. I. 496, 111 A.2d 708, and that such proof is lacking in this case.

The defendant, on the other hand, while conceding that the burden was on him to prove the fact of fraud, contends that plaintiff concealed or suppressed a material fact which it was in good faith bound to disclose, and that such concealment and suppression in the peculiar circumstances of this case were equivalent to false representation.

In effect, his argument is twofold. First, he says that he was mistaken concerning the protection available from the life insurance to be carried on Ernest's life, and that plaintiff did not disclose the limited extent of the insurance coverage knowing that to do so would result in his refusal to become a co-maker. And then he says that the circumstances attendant upon his becoming a co-maker were such that plaintiff either knew or suspected that he was acting under a misapprehension about the coverage which would be afforded by the life insurance agreed to be carried on Ernest's life, and that the mistake about the kind of coverage, if mutual, would have rendered the transaction voidable. The view he urges has been adopted by the American Law Institute, and, if supported by a factual predicate,

would deny plaintiff the privilege of non-disclosure and make fraudulent its failure to reveal to defendant the limited coverage afforded by credit group life insurance, Restatement of Contracts §471 (b) and (c), §472 (1) (b); Restatement of Restitution §8 (1) (b) and (c). See also 5 Williston, *Contracts* §1498, p. 4184 (rev. ed.).

The Restatement principle has been followed in a variety of factual situations in many jurisdictions and represents a growing trend. *Cohen* v. *Vivian,* 141 Colo. 443, 349 P.2d 366; *Donovan* v. *Aeolian Co.,* 270 N.Y. 267, 200 N.E. 815; *Haddad* v. *Clark,* 132 Conn. 229, 43 A.2d 221; *Johnson* v. *Metropolitan Ins. Co.,* 99 N.J. Super. 463, 240 A.2d 434. This principle is similar to one relied upon by the United States Supreme Court in a case involving a contract of sale which the plaintiff sought to avoid because of the misrepresentation of a material fact by the other party to the transaction. In language, which may well be applicable to our case, the court there said: "The gist of the action is fraudulently producing a false impression upon the mind of the other party; and if this result is accomplished, it is unimportant whether the means of accomplishing it are words or acts of the defendant, or his concealment or suppression of material facts not equally within the knowledge or reach of the plaintiff." *Stewart* v. *Wyoming Cattle Ranche Co.,* 128 U.S. 383, 388, 9 S. Ct. 101, 103, 32 L. Ed. 439, 441.

The trial justice followed the trend of the authorities, and he concluded that the law should afford no privilege to plaintiff who, he believed, in the circumstances of this case, owed a duty to speak out and advise defendant that what he apparently believed about the insurance on the loans was not in accord with the facts. We approve that conclusion. The circumstances found by him and upon which his conclusion was premised were, in substance, that Ernest's ill health and poor credit standing were known to the parties;

that defendant would not have become a co-maker unless the loans were covered by life insurance on Ernest's life; and that plaintiff either knew or suspected that defendant, in reliance on their conversations, believed that the loans would be paid out of the insurance proceeds in the event anything happened to Ernest. Those findings, not being clearly wrong, and not being the product of a misconception or oversight of material evidence, are entitled to great weight. They justify the conclusion that a lending institution owned and controlled by the borrower's family should have explained to the defendant the kind and type of life insurance it proposed to carry on the loan, and that its non-disclosure was equivalent to fraud.

The judgment appealed from is affirmed.

*Adler, Pollock & Sheehan, Edward L. Maggiacomo,* for plaintiff.

*Earl F. Pasbach,* for defendant.