**In re Joseph DiMARTINO, Debtor.**

**850 AQUIDNECK AVENUE ASSOCIATES, a General Partnership, Ralph Papitto and Richard Bready, General Partners of 850 Aquidneck Avenue Associates, Plaintiffs,**

v.

**AQUIDNECK COURT ASSOCIATES, a Limited Partnership, Joseph A. DiMartino and Donald T. Marini, General Partners of Aquidneck Court Associates, Defendants.**

**Civ. A. No. 89–0222 L.**

United States District Court,
D. Rhode Island.

Dec. 12, 1989.

Peter J. Cerilli and Milton Stanzler, Providence, R.I., for plaintiffs.

Robert Corrente, Providence, R.I., for defendants.

## MEMORANDUM AND ORDER

LAGUEUX, District Judge.

This is an appeal from a Decision and Order of the Bankruptcy Court issued February 15, 1989 as modified by an order of March 24, 1989.[1] The case arises out of the sale of an office building in Middletown, Rhode Island in 1984. As part of the financing arrangement for the sale of the property, the buying partnership executed a promissory note in the amount of $184,622 to the selling partnership. Before the note became due in November of 1986, the

---

1. The Decision and Order of the Bankruptcy Court is reported at 97 B.R. 139 (Bankr.D.R.I. 1989).

buying partnership brought suit against the selling partnership alleging, *inter alia,* that it had fraudulently misrepresented the unfinished status of the building at the time of the sale. The buying partnership also claimed that it should not be held liable on the note because of a failure of consideration. The selling partnership counterclaimed for the amount due on the note.

Although the Bankruptcy Court found that the buying partnership was liable on the note, it also found that there had been a failure of consideration and that the selling partnership was liable for breach of warranty and fraudulent misrepresentations. The Court's assessment of compensatory and punitive damages against the selling partnership virtually offset the buying partnership's indebtedness on the note. It is from this decision that the selling partnership and its managing general partner have appealed.

FACTS

The factual background in this case is as follows. In 1981, defendants Joseph DiMartino and Donald Marini formed a limited partnership called Aquidneck Court Associates ("ACA"). By virtue of various amendments to the limited partnership agreement, Marini and DiMartino each held an 18.5% share in the enterprise, while the remaining 63% was held by four limited partners: William Smith, Richard Lupo, T. Quinlan Regan, Jr., and Robert Blanchette.

During 1981 and 1982, ACA developed and built the property that is the subject of this suit, an office complex known as Aquidneck Court located at 850 Aquidneck Avenue, Middletown, Rhode Island. The general contractor for the project was the DiMartino Company, a corporation owned and managed by Joseph DiMartino. By the summer of 1984, nineteen of the twenty-six units in the building were rented. The remaining seven offices were unfinished: they had "rough" plumbing, electricity and HVAC (heating, ventilation and air conditioning), but no finish work had been done on those items, and the floors, ceilings and walls were also incomplete. At that time, the seven unoccupied units were under a rental option held by the General Dynamics Corporation, Electric Boat Division ("EB"). Under the signed option agreement, EB had until September 30, 1984 to exercise the option.

During the summer of 1984, DiMartino and Marini became interested in selling the Aquidneck Court property. In search of a buyer, DiMartino contacted Richard Bready and Ralph Papitto, two individuals with whom he had been involved in other real estate projects. Upon DiMartino's suggestion, Bready and Papitto became members of the partnership which bought the property located at 850 Aquidneck Avenue. It was this sale, and the events leading up to it, which gave rise to the litigation.

After DiMartino approached Bready and Papitto about the possibility of buying Aquidneck Court, they asked him to put together some information for them to review. The DiMartino Company had in its employ at that time Michael Voccola, Vice President of Development. DiMartino had hired Voccola, at Papitto's suggestion, in June of 1984 and his duties included acting as project manager for the projects which Papitto, Bready and DiMartino were involved in together. Although Voccola was on the payroll of the DiMartino Company, his time was charged to the various partnerships for which he worked. At the request of DiMartino, Voccola prepared a proposed financing package for the acquisition of the property located at 850 Aquidneck Avenue. In order to prepare this "pro forma", Voccola contacted the office of Donald Marini and arranged to meet with the Property Manager there, Robert Kielbasa, who provided him with the necessary information. In the course of his meetings with Kielbasa, Voccola never asked him whether the building had been completed and never went over to look at the property.

On the basis of the documents he had reviewed, Voccola prepared the "pro forma" and forwarded it to DiMartino, Papitto and Bready on October 22, 1984. The cover letter indicated that Aquidneck Court appeared to be a "genuinely good prospect

for purchase." In addition, Voccola noted that although there were some ambiguous circumstances, "notably the Option Agreement held by General Dynamics ... we feel the prospects of their taking the option are good, which lends all the more credence to this deal."

Sometime after receiving the pro forma projections, Bready and Papitto decided to join with DiMartino to form a partnership and purchase the property. Neither Bready nor Papitto ever made an official visit to the property prior to purchasing it, although Papitto did drive by and view the outside of the building one rainy Sunday, while giving his son a driving lesson. Both Bready and Papitto testified that they did not personally inspect the property because they were relying on DiMartino to look out for their interests as the purchasers of the property.

Three to four days before the closing, Bready and Papitto learned that DiMartino was a partner in Aquidneck Court Associates, the selling partnership, but neither sought to cancel or postpone the closing on this account. Rather, even after learning of DiMartino's involvement on both sides of the transaction, Papitto and Bready made him their managing general partner and specifically authorized him to handle the entire project on behalf of the buying partnership.

Both Bready and Papitto also knew, a day or two prior to the closing, that Attorney Jerome Batty was representing both the buying and selling partnerships, but neither voiced any concern or objection. Just prior to the closing, after learning that the building did not have ramps for the handicapped and considering that the parties had not executed a purchase and sale agreement, Bready asked Attorney Batty for representations and warranties regarding the status of the property. In response to this request a warranty letter dated November 15, 1984 was prepared and signed by both DiMartino and Marini as partners in the seller and presented to the buying partnership at the closing.

The closing for the sale of the Aquidneck Court property took place on November 15, 1984. On that day, the general partnership known as 850 Aquidneck Avenue Associates ("AAA") was formed for the sole purpose of purchasing and operating the subject property. In addition to Papitto and Bready, each of whom held a 40% interest, there were three other general partners: Joseph DiMartino, Albert V. DiMartino and Richard Lupo, each holding a 6.67% interest. At the time of the formation of the AAA general partnership, DiMartino was acting as its managing general partner, and he represented the partnership at the closing with ACA. Neither Bready nor Papitto attended the closing, although Voccola was there on behalf of AAA. Marini was present for ACA, and Attorney Batty was there representing both sides, as was DiMartino.

Although the asking price for the building and real estate was originally $2,100,000, the parties eventually settled on a purchase price of $1,900,000. As part of the financing arrangement, AAA gave a promissory note secured by a second mortgage to ACA in the amount of $184,622. At the closing, the DiMartino Company was paid $83,000 owed to it as the prime contractor for the building. Payments were also made to several other companies who had done work at Aquidneck Court. These payments were made out of the selling partnership's proceeds in order to clear any potential liens on the property.

All nineteen of the rented units at Aquidneck Court had been rented in an unfinished condition, so that the finish work could be done to the tenant's specifications. At the time of the closing, the seven vacant offices were in a similar condition. These units had unfinished walls, ceilings and floors and required finish work on the electric, plumbing and HVAC. Although Voccola did not discover that these seven units were unfinished until a couple of weeks after the closing, the condition of the building was never hidden. All the conditions were apparent just from looking in the windows of the building. In addition, DiMartino knew the exact status of the property throughout the negotiations and at the time of the closing. After discovering the

condition of the building, Voccola testified that he immediately confronted DiMartino who assured him that he would take care of it. Voccola did not advise Papitto and Bready of the unfinished condition of the building until the following spring. At that time, DiMartino indicated that the unfinished items were "tenant improvements" and that he would take care of the situation.

On March 31, 1985, as a result of increasing tension between them, Voccola resigned from DiMartino's employ and formed the Cassidy group, which was then hired by Papitto and Bready to take over the management of their four remaining projects, including the property located at 850 Aquidneck Avenue. During the summer of 1985, the Cassidy Group, as the leasing agent, made some attempts to market the unoccupied units at Aquidneck Court by doing a minimal amount of advertising, contacting Electric Boat and negotiating with existing tenants for expansion. Voccola suggested to Bready that they finish off the space to make it more rentable, but Bready was unwilling to spend the money to fix up the property. Although Voccola was successful in renting three of the seven suites to existing tenants as expansion, he was otherwise unsuccessful in renting the remaining vacant units.

In the fall of 1985, Voccola wrote to Marini, calling his attention to the unfinished condition of the building and requesting that ACA either complete the premises or deduct the cost of completion from the balance of the note. In response, Marini stated that "[a] partner in the buying entity, acting as agent for the buyer, agreed to the terms and conditions of sale and was fully aware of the condition of the building at the time of closing." Marini also pointed out that the "agreed upon sale price reflected the tenancy as well as the completeness of the structure."

On June 4, 1985, AAA, the buying partnership, filed a complaint against Aquidneck Court Associates, Joseph DiMartino and Donald T. Marini alleging, *inter alia*, failure of consideration, fraudulent misrepresentation and breach of warranty. The

defendants asserted a counterclaim for the amount due on the promissory note. While the suit was pending, in December of 1987, AAA sold Aquidneck Court to a third party for $2.3 Million.

Although this action was originally filed in the Providence County Superior Court, the matter was recast as an adversary proceeding in the Bankruptcy Court due to the fact that one of the named defendants, Joseph DiMartino, was the debtor in a bankruptcy proceeding.

The case was tried without a jury in April of 1988 and the Bankruptcy Court issued its Decision and Order on February 15, 1989. The trial judge found that the promissory note was legally enforceable but that although there could not be a total failure of consideration since the building conveyed was substantially complete, there was a partial failure due to the unfinished condition of the property. He also found that the defendants had breached certain warranties set forth in the warranty letter dated November 15, 1984 and had made fraudulent misrepresentations concerning both the completeness of the building and the status of the Electric Boat rental option. Based on these findings, the Bankruptcy Court awarded a total of $230,-150.00 in compensatory and punitive damages to the plaintiffs with the balance due on the promissory note to be offset against this amount.

On March 24, that Court issued a modification order which deleted the portion of its earlier decision dealing with the liability of the ACA partners *inter se* and clarified the parties against whom other aspects of the judgment were to run.

The case is now before this District Court on the appeal of Donald Marini and the selling partnership, Aquidneck Court Associates. After having heard arguments on the appeal the Court took the matter under advisement. The appeal is now in order for decision.

## STANDARD OF REVIEW

█ When a district court reviews a decision of the bankruptcy court, it must accept the findings of fact made by the bankruptcy judge unless they are clearly

erroneous. Fed.R.Bankr.P. 8013 (West 1984). *See In re Roco Corporation,* 64 B.R. 499, 500 (D.R.I.1986). A finding is "clearly erroneous" when the " '... reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *Id.* (citing *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). With respect to the bankruptcy court's conclusions of law, however, the "clearly erroneous" test does not apply and no special deference is owed to the decision below. *In re Kimzey,* 761 F.2d 421, 423 (7th Cir.1985); *In re S.J. Furkes,* 65 B.R. 232, 233 (D.R.I.1986); *In re Roco Corporation,* 64 B.R. at 500.

The issues raised by defendants' appeal to this Court are as follows:

(1) Did the Bankruptcy Court err in finding that there had been a failure of consideration?

(2) Did the Bankruptcy Court err in finding that Aquidneck Court Associates, the selling partnership, was liable for breach of warranty with respect to either paragraph 3 or 6 of the warranty letter?

(3) Did the Bankruptcy Court err in finding that defendants were liable for fraudulent misrepresentations with respect to either the incomplete status of the building or the status of the EB option?

(4) Did the Bankruptcy Court err in assessing compensatory and/or punitive damages against defendants?

Applying the standard set forth above this Court answers each of these questions in the affirmative. In short, the Bankruptcy Court erred in its decision on all four issues.

## IMPUTATION OF DiMARTINO'S KNOWLEDGE

The critical issue in this case is whether the trial court erred in not imputing the knowledge of DiMartino to his partners in the buying entity. It is undisputed that DiMartino was fully aware of the exact status of the property which is the subject of this suit. It is also beyond dispute that DiMartino knew prior to the closing that EB was unlikely to exercise its option to rent space at Aquidneck Court. Under Rhode Island partnership law, absent the commission of fraud on the partnership, this knowledge must be imputed to DiMartino's partners, Bready and Papitto. This general rule and its one exception are codified in R.I.Gen.Law § 7–12–23 which provides:

*Partnership charged with knowledge or of notice to partner.* Notice to any partner of any matter relating to partnership affairs, and the knowledge of the partners acting in the particular matter, acquired while a partner or then present to his mind, and the knowledge of any other partner who reasonably could and should have communicated it to the acting partner, operate as notice to or knowledge of the partnership, except in the case of a fraud on the partnership committed by or with the consent of that partner. R.I.Gen.Laws § 7–12–23 (1985).

The Bankruptcy Court held that even though DiMartino was a partner of the buying entity, it would not impute his knowledge of the unfinished condition of the building to his partners; "where he concealed important facts from [them], including: (1) his dual role, until just before the closing, (2) the unfinished condition of the building, and (3) the fact that his construction company was owed $200,000 on the job." *In re DiMartino,* 97 B.R. at 145–46. In determining that DiMartino was subject to removal from the Aquidneck Avenue partnership, the Bankruptcy Court also stated that "[h]is conscious decision not to disclose both his dual role and the true status of the structure being purchased, represent[ed] an intentional concealment of material facts, upon which the plaintiffs reasonably relied." *Id.* at 147.

Based on the evidence presented at trial, this Court determines that the Bankruptcy Court erred in concluding both as an ultimate fact and as a matter of law that DiMartino's conduct constituted the commission of fraud on his partners in the buying entity. In the absence of such fraud, DiMartino's knowledge as to the unfinished condition of the building and the

status of the EB option must be charged to his partners, Bready and Papitto. This Court must, therefore, conclude that neither Marini nor the selling partnership made any fraudulent misrepresentations to the buying group.

■ The Rhode Island Supreme Court has made very clear that an individual can only be liable for fraud where he intentionally misrepresents a material fact. *Halpert v. Rosenthal*, 107 R.I. 406, 412, 267 A.2d 730, 733 (1970). Thus, in order to recover in an action in tort for deceit, a plaintiff must show that the defendant knowingly made a false statement with the intent to deceive, thereby inducing the other party to rely on such statement to his detriment. *Katz v. Prete*, 459 A.2d 81, 84 (R.I.1983); *Halpert, supra*. Although fraud may be grounded in either affirmative acts or concealment, *Home Loan v. Paterra*, 105 R.I. 763, 768, 255 A.2d 165, 168 (1969), a plaintiff alleging such fraud must still establish that a defendant knowingly created false impressions of material facts with the intent to deceive. *Holmes v. Bateson*, 434 F.Supp. 1365, 1387 (D.R.I. 1977), *modified*, 583 F.2d 542 (1st Cir. 1978).

■ Since the Rhode Island legislature did not include a definition of "fraud" when it enacted R.I.Gen.Law § 7–12–23, it is logical to infer that it intended to incorporate into the statute the well established common law definition of "fraud" as enunciated by the state courts. Applying that state law, this Court concludes that DiMartino did not commit "fraud" upon his partners in the buying entity.

As previously stated, the Bankruptcy Court gave three reasons for not imputing DiMartino's knowledge to his partners: that he concealed from them (1) his involvement on both sides of the deal, (2) the fact that his company was owed $200,000 on the project and (3) the unfinished condition of the building.

With respect to the first of the alleged concealments, it is uncontradicted that both Papitto and Bready knew prior to the closing and prior to making DiMartino their managing partner that he was involved on both sides of the transaction. As a matter of law, this is not concealment under even the most expansive definition of that term.

Similarly, the debt owed to the DiMartino Company (which was actually $83,000) was specifically set forth in the closing documents. That was not material, in any event, because it came out of the selling group's proceeds of the sale. Anyway, this does not amount to intentional concealment under Rhode Island law. Neither Bready nor Papitto ever questioned DiMartino's involvement with the selling partnership nor asked for any details regarding his role in the construction of the building. Furthermore, neither Bready nor Papitto attended the closing or asked to review any of the documents prior to the closing date. Simply put, they never tried to obtain any of the information which they now assert was concealed from them. In addition, there is no evidence that they were induced to make the purchase in reliance on either of these alleged misrepresentations.

Finally, the Bankruptcy Court stated that DiMartino committed fraud by concealing the fact that the building was unfinished. One of the major areas of contention throughout the trial was what "complete" meant. DiMartino believed that the building was "complete" for leasing purposes. Thus, even if DiMartino did tell Bready and/or Papitto that the structure was "complete", the fact that he meant something different than they understood does not make his statement an intentional misrepresentation. That was a matter of "opinion" which cannot form the basis of a fraud claim.

Furthermore, even assuming that the building was unfinished or incomplete and that Bready and Papitto were unaware of that, the evidence does not support a finding that DiMartino intentionally concealed from them the status of the property. Both Papitto and Bready were free to go down and look at the property at any time. Papitto even testified that he did drive by and look at the building one afternoon but that he did not get out of the car because it was raining. Although failure to make further inquiry will not bar an action for

deceit "where one relies upon another's representation of an existing fact and is thereby misled to his damage," *Campanelli v. Vescera,* 75 R.I. 71, 74, 63 A.2d 722, 724 (1949), there is not sufficient evidence in this case of any intent to deceive on the part of DiMartino. Certainly if his intention was to hide the fact that the building was unfinished, he would not have given Papitto directions to the property. Rather, the evidence establishes that Bready and Papitto simply relied on DiMartino's judgment that the purchase of this property was a good investment and elected not to ask searching questions about the specifics of the transaction.

■ Based on the preceding analysis, this Court concludes that DiMartino did not commit fraud upon his partners in the buying partnership and therefore, all of his knowledge about the property must be imputed to them. Although in hindsight Bready and Papitto recognize that they should not have given DiMartino so much authority, they did rely on him to represent their interests in this deal and they cannot renege on their obligations simply because things have failed to turn out the way they expected. As a general rule, when there are two innocent persons and one must suffer because of actions of a third party, the one who reposed faith in the wrongdoer must bear the loss. *See Nichols v. Isla de Panay,* 267 U.S. 260, 262, 45 S.Ct. 269, 269, 69 L.Ed. 603 (1925); *Martin v. Nager,* 192 N.J.Super. 189, 469 A.2d 519, 527 (1983). In this case, where both Marini and the Bready/Papitto partnership were essentially innocent parties, notions of equity require that Bready and Papitto must bear the loss. Actually, there was no loss. Bready and Papitto turned a nice profit on the resale of this property.

## FRAUDULENT MISREPRESENTATION

Even if this Court had determined that it should not impute the knowledge of DiMartino to his partners, Bready and Papitto, it would still conclude that the Bankruptcy Court erred in holding that Marini and the selling partnership made fraudulent misrepresentations to the buying partnership.

The alleged misrepresentations that are at issue on this appeal are twofold: 1) a misrepresentation as to the unfinished condition of the building and 2) a misrepresentation on the status of the EB option.

■ With respect to the incomplete status of the building, virtually all of the alleged misrepresentations and omissions alluded to by the trial judge were made by DiMartino to his partners in the buying entity. Both Bready and Papitto testified that they never spoke to Marini at any time, before or after the closing. Thus Marini, who was the managing partner of the selling partnership, ACA, never made any representations to either one of them. Marini certainly had no reason to make representations to DiMartino with regard to the status of the building since DiMartino had constructed the building and was fully aware of its unfinished condition.

Bready and Papitto testified that they relied on the pro forma statement which the Bankruptcy Court found constituted an assertion that the building was complete and ready for occupancy. However, even if the "pro forma" did make such an assertion, the Bankruptcy Court erred in attributing that statement to Marini or the selling partnership. At the time that Voccola prepared the "pro forma", he was an employee of the DiMartino Company but his time was charged to the various Bready–Papitto–DiMartino partnerships. After preparing the document, Voccola sent it to and reviewed it with Bready and Papitto but not Marini. Marini's only role was to provide Voccola with access to the books and records on the project and in light of the fact that he never even saw the proposal or knew what it said, the Court finds no evidence of an intent on the part of the defendants to use the "pro forma" to deceive the buying entity. Thus, it was clear error for the Bankruptcy Court to find that the "pro forma" created a fraudulent misrepresentation by the defendants to the buying partnership. The blunder that was committed here was that Voccola never examined the property before he made the pro forma statement and delivered it to the buying group. Clearly, he was acting as

an agent of the buying partnership in preparing the "pro forma" and his mistake cannot be attributed to the selling partnership.

■ Similarly, the Bankruptcy Court's finding of a fraudulent misrepresentation with respect to the status of the EB option was erroneous. There was considerable uncertainty, even as of the time of trial, as to whether EB's option expired on September 30 (six weeks before the closing) or on December 1 (two weeks after the closing). The option actually expired on September 30. The confusion arose as a result of the fact that, in October of 1984, Marini sent EB an extension of the option to December 1, which EB never signed. The Bankruptcy Court found that Marini intentionally misrepresented the likelihood of EB exercising the option with the intent of inducing the buyers to enter into the sale. Such a finding simply does not comport with the evidence produced during the trial. Voccola testified that he knew at the time of the closing that the option had technically expired. DiMartino also knew a week or so before the closing that EB was unlikely to exercise the option. Bearing in mind that neither Papitto nor Bready ever talked to Marini, the fact that neither their own managing general partner nor the employee working for their partnership told them the status of the option does not create a misrepresentation *by the seller*. It was clearly not the duty of Marini or ACA to make sure that DiMartino kept his partners fully informed. Thus, it cannot be said that the selling partnership acted with the intent to deceive since its managing partner, Marini, conveyed to Voccola and DiMartino all the pertinent facts concerning the option. In sum, plaintiffs failed to establish any misrepresentation by ACA, with intent to deceive, upon which AAA relied to its detriment. The Bankruptcy Court's finding of a fraudulent misrepresentation in this regard was clearly erroneous under *Halpert* and its progeny.

BREACH OF WARRANTY

The Bankruptcy Court found the selling partnership liable for breach of warranty

on two grounds. First, it found that the selling partnership breached paragraph 3 of the warranty letter which stated that the building was fully "independent". Second, it found that because the building did not have required fire walls and lacked a proper certificate of occupancy, the selling partnership was in breach of paragraph 6 of the warranty letter which stated that the building was in conformity with federal, state and local regulations relating to such matters. The Bankruptcy Court erred in finding ACA liable for breach of warranty on these two grounds.

■ Paragraph 3 of the warranty letter signed at the closing provided that:

The building on the property is fully independent in all respects including, without limitation, in respect of its structural integrity, heating, ventilation and air conditioning, plumbing, mechanical and other operating and mechanical systems, electrical, sanitation and water systems which are connected directly to off-site utilities located in public streets or ways. Each such building, all related service equipment and all paved or landscaped areas relating to or used in connection with such building are located wholly within the perimeter lines of the property.

Plaintiffs attempted at trial to show that the operant word "independent" was synonymous with "complete", and on that basis, argued that this provision warranted that the building was ready for occupancy. This Court is in agreement with the bankruptcy judge's finding that the word "independent" as used in paragraph 3 of the warranty letter did not mean "complete" but rather was "self-explanatory and connot[ed] a building and components that [were] not dependent on any other structure." *In re DiMartino*, 97 B.R. at 144. However, the Bankruptcy Court went on to find that there was a breach of paragraph 3 in that it "refer[red] specifically to items that the defendants knew were not included in the premises to be conveyed." *Id.* He stated:

A prudent reader of that paragraph could reasonably assume that the build-

ing was equipped, at least, with heating, ventilation, air conditioning, and plumbing—this is what the sellers intended to be understood by that language, and this is precisely what the plaintiffs relied on when they purchased the subject property. *Id.*

Neither party ever pleaded, requested or even mentioned such a theory of liability at any point during the course of the litigation. This Court concludes that the Bankruptcy Court's finding that reference to various systems in the building constituted a warranty of the completeness of every system was erroneous as a matter of law and completely unwarranted based on the evidence produced at trial. Moreover, the trial judge's finding that the buying group relied on such language in purchasing the property was clearly erroneous since it was uncontroverted that neither Papitto nor Bready read the warranty letter until months after the closing.

■ The plaintiffs at trial also argued that the selling partnership, ACA, breached paragraph 6 of the warranty letter. That paragraph provided, in relevant part, that the building did not violate any federal, state or local regulations relating to fire protection or building use and occupancy. The Bankruptcy Court found, (1) that the absence of a required fire wall constituted a material breach of warranty and (2) that the sellers' failure to obtain more than a temporary certificate of occupancy constituted a breach of the warranty letter. The Bankruptcy Court, however, did not find any damages proximately resulting to the buying partnership with respect to the lack of proper fire walls. Therefore, this Court does not have to consider whether there was a breach of warranty in that regard.

Similarly, even if this Court assumes that there was a breach of warranty with respect to the lack of a proper certificate of occupancy, there was no evidence produced at trial of any damages which resulted from that alleged violation. According to the testimony of Voccola, he never lost an existing or a prospective tenant based on the lack of a certificate and never contact-

ed the Building Inspector to attempt to obtain a certificate.

The no-harm-no-foul rule of the basketball court should be applied in this law court. Since the buying partnership has suffered no monetary harm from any alleged breach of either paragraph 3 or paragraph 6 of the warranty letter, ACA, the selling partnership, is not liable and there can be no set-off to the sums owed on the note by AAA.

## FAILURE OF CONSIDERATION

■ R.I.Gen.Laws § 6A–3–408 (1985), states in relevant part that "[w]ant or failure of consideration is a defense as against any person not having the rights of a holder in due course (§ 6A–3–305), ... Partial failure of consideration is a defense pro tanto whether or not the failure is in an ascertained or liquidated amount." Basing its analysis on this statutory language, the Bankruptcy Court found that there was a partial failure of consideration in this case due to the incomplete status of the building conveyed and, therefore, held that the buyers were entitled to offset as much of the note as related to the cost of finishing the units. In addition, it found the selling partnership liable because the purchase price of the property was intended to reflect a completed structure. That determination is clearly erroneous.

It should be clear from what has already been stated in this opinion that there was no failure of consideration here. The buying partnership received what it bargained for (a substantially completed office building), never sought to rescind that transaction, and later sold the property at a large profit. There was no partial failure of consideration in the instant case because DiMartino knew the exact status of the building he and his partners were purchasing. The Bankruptcy Court found that in light of DiMartino's "clandestine behavior", it could not impute his knowledge of the unfinished condition of the building to the buying partnership. For the reasons previously discussed, that conclusion is wrong as a matter of law. DiMartino's knowledge must be imputed to his partners in the buying partnership. Therefore, the

buying partnership knew that seven of the units in the building were unfinished at the time of the sale, there was no failure of consideration and the Bankruptcy Court erred in awarding damages to the plaintiffs as a set-off against the note.

## COSTS AND ATTORNEYS' FEES

Marini and ACA have requested that this Court award them costs and attorneys' fees. The note provides: "If the full amount of this Promissory Note shall become due and payable and shall be placed by the holder hereof in the hands of an attorney for collection, through legal proceedings or otherwise, the undersigned will pay a reasonable attorney's fee to the holder hereof together with the reasonable costs and expenses of collection." The determination of what, if any, costs and expenses of collection and attorneys' fees should be awarded must be made by the Bankruptcy Court in the first instance. Therefore, this Court will not consider that matter at this time.

## CONCLUSION

For the reasons stated above, the Judgment of the Bankruptcy Court dated February 15, 1989 as amended by the Order by that Court dated March 24, 1989, hereby is *reversed.* This case is *remanded* to the Bankruptcy Court for entry of judgment for the selling partnership, Aquidneck Court Associates, on the promissory note against Ralph Papitto, Richard Bready and 850 Aquidneck Avenue Associates after said Court considers what, if any, attorneys' fees and/or costs and expenses of collection should be included in that judgment.

*It is so Ordered.*